[No. B167287. Second Dist., Div. Eight. Dec. 21, 2005.]

MEGAN A. KELLY, Plaintiff and Appellant, v.
STAMPS.COM INC., Defendant and Respondent.

[No. B171369. Second Dist., Div. Eight. Dec. 21, 2005.]

MEGAN A. KELLY, Plaintiff and Respondent, v.
STAMPS.COM INC., Defendant and Appellant.

**COUNSEL**

Kring and Chung, Kyle D. Kring; Shanberg Stafford, Ross E. Shanberg and Shane C. Stafford for Plaintiff and Appellant and for Plaintiff and Respondent.

Winston & Strawn, Paul J. Coady and S. Shane Sagheb for Defendant and Respondent and for Defendant and Appellant.

**OPINION**

**COOPER, P. J.**—These appeals arise out of a summary judgment granted to defendant Stamps.com Inc., in plaintiff Megan A. Kelly's action for wrongful termination and nonpayment of wages. In B167287, plaintiff appeals from

that judgment, while in B171369 defendant appeals from a postjudgment order denying its motion for attorney fees.

On plaintiff's appeal, we conclude that summary judgment should not have been granted, except with respect to two causes of action. We reverse the judgment and remand for entry of a limited summary adjudication order. On defendant's appeal, we affirm the order denying attorney fees, as defendant is no longer the prevailing party entitled to claim them.

## *THE SUMMARY JUDGMENT*

## FACTS

Plaintiff's first amended complaint (FAC) alleged at its outset claims for violation of the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; FEHA) and of public policy, to the effect that defendant on February 6, 2001 had discharged plaintiff from her employment as its vice-president of marketing, "because she was seven months pregnant and was planning on taking her promised paid maternity leave in connection with the birth of her child in April of 2001." A third cause of action, for breach of contract, alleged that following a large reduction in workforce in October 2000, defendant had promised plaintiff a substantial retention bonus (35 percent of her $150,000 annual salary), to be paid in two installments, the second one on April 20, 2001. This promise allegedly created an implied contract that plaintiff's employment would continue until at least April 21, 2001, which defendant breached by terminating her sooner. Plaintiff also alleged this breach, in a fourth cause of action, as one of the covenant of good faith and fair dealing. In a fifth cause, the FAC alleged that defendant's failure to pay plaintiff's remaining bonus upon her termination constituted a breach of contract and a violation of Labor Code sections 201 and 2926. A sixth cause alleged that, in violation of public policy, defendant had terminated plaintiff in order to avoid paying her wages due, including her bonus.[1]

Defendant moved for summary judgment, or alternatively for summary adjudication of each cause of action. Defendant asserted that plaintiff's primary claims, for unlawful discharge on account of pregnancy, were unmeritorious because plaintiff had been terminated as part of a reorganization of defendant, with a further reduction of workforce, and she could not establish a triable issue that this reason was a pretext for pregnancy discrimination against her. With respect to the other four causes of action, defendant asserted that plaintiff's employment had been at will, and she had been terminated for good cause. Defendant supported its contentions with the

---

[1] The FAC included three further causes of action, which plaintiff has now abandoned. One of them was asserted against defendant's former chief executive officer, Bruce Coleman, who successfully demurred to it. Plaintiff does not seek reversal of the judgment with respect to Coleman.

following facts and evidence, derived from documents and from declarations by Kenneth McBride and Kathleen (Kathy) Brush.[2]

Defendant sells postage and related services on the Internet. Defendant hired plaintiff as its vice-president of direct marketing on October 20, 1999, at a base salary of $130,000 a year, later increased to $150,000. (Plaintiff's title at some point changed to simply vice-president of marketing.) Upon hiring, plaintiff executed an employment agreement and a confidentiality agreement, both of which provided that her employment was at-will, terminable by either party with or without reason. Plaintiff performed marketing activities for defendant's small business unit, headed by Doug Walner, her immediate superior. According to McBride, chief financial officer at the time and later also chief executive officer (CEO), plaintiff was hired and responsible primarily for direct marketing, to both existing and potential customers.

In the same year that plaintiff was hired, defendant suffered a precipitous decline in stock value (over 93 percent), and a continual loss of capital, stemming from excess expenditures over revenues. To reduce expenses, in October 2000 defendant laid off about 240 of its then approximately 540 employees. Plaintiff—who, according to the FAC, had made it known the previous month that she was pregnant and would be taking maternity leave in April 2001—was not among those so terminated. Moreover, as part of a program to retain remaining employees, plaintiff in October received stock options and was awarded a cash retention bonus of 35 percent of her $150,000 salary (or $52,500), to be paid one-third in 90 days, and two-thirds in 180 days (April 20, 2000), provided she remained employed by defendant at those times.

Also in October 2000, defendant hired a new CEO, Coleman, who brought in as a contracting consultant Kathy Brush, a marketing expert and turnaround specialist. Brush was charged with recommending ways to cut defendant's costs and streamline its marketing efforts. According to both her and CFO McBride, upper management "had become generally dissatisfied with the performance of the marketing group in the Small Business Unit."[3]

Early in 2001, defendant's management decided that the company's cash flow required another reduction in workforce, by approximately 150 employees, which would be implemented in early February. Concurrently, defendant would consolidate its three separate business units, including the small business unit, into one. The sales and marketing functions of these units

---

[2] We focus here on the evidence and proceedings with respect to the two discriminatory discharge causes of action. Additional facts relevant to the remaining four claims are reviewed in the discussion.)

[3] Defendant did not present any testimony by its former CEO Coleman.

likewise would be combined in one group. Coleman directed Brush to evaluate defendant's marketing employees, and inform him who should be retained for the new sales and marketing group. Brush declared that she evaluated plaintiff on the merits and without regard to her pregnancy. At least once in December 2000 or January 2001, however, Coleman told McBride he believed plaintiff's attendance was poor, and he used the term "checked out" to refer, according to McBride, "to her poor attendance and attitude."

On February 2, 2001, Brush submitted to McBride a list of marketing employees to be retained. It did not include plaintiff. McBride consolidated the list with those he had received from other managers, and presented the combined list to Coleman, who approved Brush's recommendations. Plaintiff was terminated on February 6, 2001, the same day as the rest of those laid off. She received 60 days' severance pay, or $25,000.

Brush's declaration attached a written evaluation of plaintiff, of a type Brush was asked to prepare, "[p]rior to the announcement of the February 2001 layoffs," regarding each employee she reviewed. In it, Brush stated that plaintiff was not responsible for "products and partners," but for direct marketing programs, which had been reduced and were scheduled for further reduction along with the personnel layoffs. (McBride testified that defendant's marketing budget had decreased from $20.5 million for the third quarter of 2000 to $4.3 million for the first quarter of 2001.) Brush's evaluation also stated she had not considered plaintiff for vice-president of marketing after the restructuring, because that position "will be assumed by a generalist that will oversee direct marketing, sales, product marketing and business development for both the postage and shipping groups. These are qualifications that [plaintiff] does not have." Nor, Brush opined, was plaintiff appropriate for the position of director of a general team that would perform limited direct marketing, because of her "inflexibility" with projects (apparently in terms of size or expense) and ineffectiveness as a leader. Brush appraised plaintiff as of "limited motivation," often arriving late. Her atttendance had improved in January, "when the CEO noted to Doug Walner that [plaintiff's] attendance was not good."

Upon consolidation, Brush assumed supervision of the sales and marketing group. Although still engaged as a contractor, she took the same title as plaintiff had had, vice-president of marketing. Nonetheless, Brush declared that "Plaintiff's position as Vice President of marketing was . . . eliminated entirely in the February 2001 restructuring and she was not replaced."

In her opposition to the motion for summary judgment, plaintiff agreed that in February 2001 defendant had implemented a restructuring and reduction in force to reduce costs. Plaintiff undertook to show, however, a triable issue

that this tendered justification for her termination was a pretext for discharge on a discriminatory basis. To this end, plaintiff presented a declaration by her former supervisor Walner, and excerpts of the depositions of McBride, vice-president Ian Siegel, and plaintiff herself.

Walner, formerly manager of the small business unit, gave an appraisal of plaintiff's responsibilities and performance at odds with Brush's. He declared that plaintiff's duties had included overseeing not only direct marketing, but also online marketing, television, print, and general marketing, as well as brand marketing. The latter "pervade[d] everything [defendant] did with partners and sales . . . ." In these matters, plaintiff was an excellent employee, very good at all aspects, with a like understanding of brand marketing and its goals. She "was also a very committed employee and never . . . did I see a change in [plaintiff's] commitment to [defendant]."

Walner attached a formal assessment of plaintiff, which he had prepared in October 2000. On a five-level scale, from outstanding to below expectations, he had rated her "Above Expectations," the second-highest level, in five categories, and a one notch further down ("Meets Expectations") for "Leadership Skills." He also had answered affirmatively the question whether plaintiff was "Indispensable to [defendant's] business needs," and had given as reasons plaintiff's "Run[ning] significant portion of acquisition," her management of "key branded marketing programs," and that she had the respect of her department as a leader.

With regard to plaintiff's nonretention, Walner declared that CEO Coleman had asked him to prepare a list of employees within the unit who should be retained after the impending force reduction. Walner had included plaintiff on the list, because her involvement in and knowledge of marketing would perfectly fit the need for an overseer of a reduced group.

Walner gave this list to Coleman, and they later discussed it. Coleman asked why Walner had included plaintiff, and Walner replied he felt she was the only person capable of managing the group, particularly as Walner would not be staying. Coleman repeated the question, and commented that plaintiff had mentally "checked out." According to Walner, Coleman then "made intonations about [plaintiff] being pregnant, saying she had mentally 'checked out,' and questioning whether she was really doing her job." Walner responded, "You know that is not true," and defended plaintiff's commitment, hard work, and singular ability "to take that group forward without me there."[4]

---

[4] Walner denied telling anyone at defendant that plaintiff wasn't doing a good job and didn't enjoy managing people, yet should be retained, in part because she was pregnant. In her written evaluation of plaintiff, Brush had stated Walner had told her this.

A similar account was provided by Ian Siegel, defendant's vice-president for web development until April 2001, and a self-described member of defendant's senior management team. He testified that almost all of defendant's marketing programs proceeded using technology his department developed. Siegel worked with plaintiff almost daily, as she was head of marketing and was involved in not only direct marketing but also "partnering" with other companies, as well as brand development and other functions. According to Siegel, plaintiff worked in the small business unit only after a substantial period as "the operational head of marketing" for defendant, reporting to five different nominal superiors. He considered plaintiff extremely competent, and a tremendous asset to defendant.

Siegel further testified that before plaintiff's layoff, Coleman called him in and asked his opinion—because he worked with the marketing group daily—about who in that group were strongest and should be kept on. Siegel replied, "You absolutely have to . . . start with [plaintiff], she is the heart and soul of that team," and he couldn't imagine it functioning without her. Coleman replied, "Megan has checked out." Siegel said it would be a mistake to assume that. Coleman repeated that plaintiff had "checked out," saying it "in a definitive, end-of-conversation type of way." He and Siegel then proceeded to discuss other marketing employees.

Over defendant's objections, Siegel specifically and diametrically disagreed with each statement that Brush had made regarding plaintiff in her written evaluation. He also recounted that after plaintiff's departure, Brush had taken over plaintiff's position as operational head of marketing, assuming management of the partner program, messaging, and design of the Web site, "all of the things that Megan had done prior to Kathy taking over."

In her own deposition, plaintiff described commendations she had received from numerous members of defendant's management during her tenure, and she testified none had ever commented negatively on her performance.

Regarding her discharge, plaintiff stated she had been concerned just before February 6, 2001, because she had not been informed of her impending status, or asked for her input, as had other vice-presidents. Moreover, Walner and Siegel had told her how Coleman had referred to her having "checked out." Plaintiff accordingly met with Mike Zuercher, a house counsel for defendant, on the afternoon of February 5. She expressed her fear that she would be included in the reduction in force, notwithstanding her group had been performing well. Referring to Coleman, plaintiff told Zuercher, "I don't know what he means by 'checked out." I can't help to think that he thinks I am checked out because I'm pregnant and I am going to go off on maternity leave . . . .' "

Plaintiff also told Zuercher she was concerned that perhaps McBride wanted her gone. She related that she had heard McBride had made vulgar, derogatory remarks about her, which led her to believe he might now want to get rid of her.[5] Zuercher told plaintiff he would share her concerns with Coleman. Later that day, Zuercher told her, "I talked to Bruce [Coleman]."

After her discharge, plaintiff testified, she requested a meeting with Coleman. It was held on February 12, 2001, with Zuercher also in attendance. Plaintiff told Coleman of her beliefs about her discharge, and asked him to explain, in light of her having been at the top of Walner's list. Coleman replied that she hadn't been on Walner's list. This heightened plaintiff's confusion. Coleman told plaintiff he had never discriminated against anyone, and offered to list people whom she could ask about it. He also told plaintiff that defendant had eliminated her position. She stated that she did not so understand, because many of her functions were then still ongoing.

McBride testified that Brush's report was in plaintiff's personnel file. It also had been sent to him by Brush, as an e-mail attachment, on February 5, 2001. Finally, plaintiff testified she had been informed that maternity leave benefits included insured disability leave at two-thirds of salary for six weeks, followed by company paid leave for six more weeks.

At the hearing of the motion for summary judgment, the trial court initially indicated its tentative view that although defendant had made a showing of legitimate reasons for plaintiff's layoff, plaintiff had presented substantial evidence that these reasons were a pretext. The court stated that the case was triable, observing that "her firing, if it was not done for discriminatory purposes, was very inartfully executed." The court also remarked, "It does lead one to believe that a company in financial trouble was looking to get rid of an employee for whom they were going to have to keep on the books because they promised her maternity leave . . . ."

At a further session the following day, the court announced it was inclined to change its tentative ruling, It expressed the view that if Brush assumed, or "subsumed," plaintiff's duties together with others, then the reason for plaintiff's discharge was not pretextual.

Following the hearing, the court granted the motion for summary judgment, and issued "findings of fact and conclusions of law" in explanation of its ruling. (Cf. Code Civ. Proc., § 437c, subd. (g).) With respect to the

---

[5] The vulgarism in question had been "milf," which McBride testified meant "The mother I'd like to f_ck." He stated that between fall 1999 and spring 2000, his then boss, former CFO John Lavalle, had frequently used the term, referring to plaintiff, and McBride also had used it, in response to Lavalle's questions or comments.

discrimination claims, the court ruled that plaintiff had shown a prima facie case of discriminatory discharge, but ultimately had not established that defendant's proferred reason, the corporate restructuring and consolidation of her position with others, had been pretextual. The court found the remaining four causes of action lacked merit because plaintiff had been terminated for good cause.[6]

## DISCUSSION

### 1. *The Discrimination Claims.*

We consider first the trial court's summary adjudication of plaintiff's first two causes of action, for discriminatory discharge on the basis of pregnancy, in violation of FEHA and of public policy. (See *Badih v. Myers* (1995) 36 Cal.App.4th 1289 [43 Cal.Rptr.2d 229].) On this as on plaintiff's other causes of action, we review the court's decision de novo. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) The scope of each party's substantive burden in this type of case was delineated in *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 354–357 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).

■ Ordinarily, a plaintiff employee who claims discrimination must first make a prima facie case, consisting of evidence that she was within the class protected from discrimination and was performing her job competently, but was terminated—plus some other circumstance suggesting discriminatory motive. (*Guz, supra,* 24 Cal.4th at pp. 354–355.) This showing raises a presumption of discrimination, shifting to the defendant employer the burden of producing evidence to establish a genuine issue that the termination was made for a legitimate, nondiscriminatory reason. (*Id.* at pp. 355–356.) If the employer does so, the presumption disappears, but the employee, who retains the overall burden of persuasion, may then yet seek to show discriminatory motive, by evidence that the employer's proffered reason was false and a pretext, and any other evidence of discriminatory motive. (*Id.* at p. 356.)

■ A defendant employer's motion for summary judgment slightly modifies the order of these showings. If, as here, the motion for summary judgment relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a

---

[6] After the court initially rendered its "findings," defendant moved ex parte to correct certain patent factual errors in them (such as attribution of statements to the wrong individual). The court granted the application and issued an amended set of findings. Plaintiff contends that these proceedings denied her due process. They did not, and in any event plaintiff was not prejudiced, the significance of the original findings having been plain.

trier. of fact to find, more likely than not, that they were the basis for the termination. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851 [107 Cal.Rptr.2d 841, 24 P.3d 493]; cf. *Guz, supra,* 24 Cal.4th at p. 357.) To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred. (*Aguilar,* at pp. 850–851; *Guz,* at p. 357.) In determining whether these burdens were met, we must view the evidence in the light most favorable to plaintiff, as the nonmoving party, liberally construing her evidence while strictly scrutinizing defendant's. (*Aguilar,* at p. 856.)

The basis for defendant's motion was that plaintiff was terminated for legitimate, nondiscriminatory business reasons, namely defendant's economically induced restructuring and reduction in force in February 2001. From the evidence defendant initially presented, this explanation may be deemed a legitimate, nondiscriminatory reason, sufficient to shift to plaintiff the burden of showing a triable issue of its falsity, with respect to her, and ultimately of discriminatory motive instead. Whether plaintiff satisfied this burden remains the principal issue.

██ Defendant makes a preemptive argument that lacks merit. In her separate statement of facts, plaintiff admitted that defendant underwent the restructuring and layoffs in February 2001. But she did not admit, there or ever, that this had been the actual, motivating reason for her discharge. Defendant's contention that plaintiff's admission precluded her from claiming that defendant's adduced neutral reason was untrue is therefore meritless. As explained in *Guz, supra,* 24 Cal.4th at page 358, "[D]ownsizing alone is not necessarily a sufficient explanation, under the FEHA, for the consequent dismissal of [a protected] worker. An employer's freedom to consolidate or reduce its work force, and to eliminate positions in the process, does not mean it may 'use the occasion as a convenient opportunity to get rid of [protected] workers.' [Citations.] Invocation of a right to downsize does not resolve whether the employer had a discriminatory motive for cutting back its work force, *or engaged in intentional discrimination when deciding which individual workers to retain and release.*" (Italics added.)

Defendant also argues that any possibility of discriminatory motive in plaintiff's discharge was lacking because defendant did not discharge plaintiff, and in fact awarded her a retention bonus, during the initial, October 2000 layoffs, even though, as plaintiff alleged, she had made known to defendant in September her pregnancy and intent to take maternity leave at the end of April 2001. This contention fails, however, because neither Coleman nor Brush, the alleged decision makers in plaintiff's firing, was involved with the October layoffs and bonuses.

Plaintiff did adduce evidence of a number of circumstances that cast doubt on the genuineness of defendant's explanation for her discharge. First, plaintiff was let go despite a record of excellence in her executive responsibilities, as attested to by both her superior (Walner) and another high executive with whom she worked continually (Siegel). Second, when these executives were asked by Coleman who should be retained in marketing, they both proffered plaintiff, and attested to her abilities to manage marketing efforts in a period of downsizing and transition. Third, however, Coleman dismissed this advice, with the peremptory expression that plaintiff had "checked out." As discussed below, this reaction and terminology are not, as the trial court suggested, unamenable to signifying a discriminatory animus. Indeed, in at least one instance when he used the phrase concerning plaintiff, Coleman also referred in some fashion to her pregnancy. Moreover, even if the language be deemed nondiscriminatory in isolation, there is no doubt that Coleman's manifest attitude toward plaintiff's retention was bluntly negative, in vivid contrast to the views and assessments of those executives who worked with her.[7]

■ Furthermore, there was evidence that Coleman lied to plaintiff when she asked him to explain her termination, on February 12, 2001. Coleman denied that plaintiff had been on Walner's list of persons suggested for retention. But according to Walner, not only had plaintiff been on his list, she had been the first one he had mentioned and commended when Coleman later asked him about his preferences. As is the case with evidence of false reasons, a finding that Coleman was knowingly untruthful here could give rise to an inference that "the employer [wa]s dissembling to cover up a discriminatory purpose." (*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 147 [147 L.Ed.2d 105, 120 S.Ct. 2097] (*Reeves*).)[8]

In the same meeting, Coleman also told plaintiff that she had been discharged because her position had been eliminated. Defendant presently repeats this reason for plaintiff's discharge, together with and as a refinement of the more general reason of reorganization and layoffs. But the evidence reflects a triable issue whether the claim that defendant eliminated plaintiff's position was true or untrue.

---

[7] Defendant contends that Coleman's statements and attitude are irrelevant, because Brush, not he, was the decision maker in plaintiff's discharge. This is hardly a triable contention, in light of Brush's and McBride's testimony about the decisional process. Brush was an outside consultant, who advised Coleman, the CEO. The evidence supports if not mandates a finding that Coleman was the decision maker.

[8] "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz, supra,* 24 Cal.4th at p. 354.)

First, a new (and not pregnant) individual, Brush, assumed plaintiff's title of vice-president of marketing after plaintiff left. Second, plaintiff and Siegel effectively testified that Brush thereafter performed plaintiff's former functions, and served, as had plaintiff, as the "operational head of marketing." Although defendant stresses that this testimony did not establish that Brush was performing all of the functions and programs plaintiff had run, even evidence that one or more programs were discontinued at one point or another would not establish that plaintiff's position was eliminated, as opposed to her having been replaced. (See *Barnes v. GenCorp Inc.* (6th Cir. 1990) 896 F.2d 1457, 1465 (*Barnes*).)

Defendant's further argument that plaintiff did not negate Brush's having performed duties additional to plaintiff's also does not validate the claim of "position elimination." Defendant's evidence did not establish that Brush performed such additional duties, and it was defendant's burden to show that plaintiff's position was eliminated, the essence of defendant's espoused legitimate, nondiscriminatory reason for dismissing her. Moreover, Brush was not "another employee assigned to perform the plaintiff's duties in addition to other duties," as referred to in *Barnes, supra*, 896 F.2d at page 1465. Rather, Brush was an independent consultant, who was not assigned to perform marketing duties for defendant until plaintiff was fired. In sum, there is a triable issue whether the claim plaintiff's position was eliminated—as offered in explanation by Coleman in 2001 and by defendant now—is valid.

The content and circumstances of Brush's written evaluation of plaintiff also lend support to plaintiff's claims, both of false reasons and of discriminatory purpose. First, Brush's negative opinions conflicted with those of defendant's managers who were more familiar with plaintiff and her performance. Second, plaintiff presented evidence indicating that Brush's evaluation may have been prepared or utilized as a pretext. McBride testified that the evaluation had been attached to an e-mail Brush sent him. Dated February 5, 2001, at 7:41 p.m., the e-mail stated that Brush was including two files regarding employee evaluations, one about elimination of positions and the second with notes on performance. Brush stated that the first document was "[h]opefully . . . all that will be needed if anything is needed."[9]

This e-mail was sent just hours after plaintiff had complained, to Zuercher, that Coleman might be contemplating letting her go because of her pregnancy. And a copy of Brush's evaluation ended up in plaintiff's personnel file.

---

[9] Plaintiff filed her opposition to the motion for summary judgment before she received this e-mail in discovery, and she did not seek to augment her opposition with it until the hearing. The trial court refused to receive it then, but later stated that it had considered the document in ruling on plaintiff's motion for reconsideration. Both parties have discussed the e-mail in their arguments. We deem it qualified for consideration here.

In short, within a day, plaintiff complained of possible discrimination, Coleman was notified, Brush sent her evaluation of plaintiff to top management, and plaintiff was discharged. From this it could be inferred that the evaluation was either prepared or at least transmitted the night before the layoffs in an effort to preempt or rebut plaintiff's incipient claim of discriminatory discharge.

We conclude that plaintiff presented a triable issue that the reason or reasons defendant gave for her termination were false. While this showing was substantial, in order to avoid summary judgment plaintiff also had to tender—most aptly as part of her prima facie case—evidence of pregnancy-discriminatory motive on defendant's part. (*Guz, supra*, 24 Cal.4th at pp. 361–362; *Reeves, supra*, 530 U.S. at pp. 147–149; *St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 511 [125 L.Ed.2d 407, 113 S.Ct. 2742].)

Plaintiff established this element of her case as well.[10] Much of the evidence that defendant's reasons were pretextual, cited *ante*, also supported an inference that the actual reason for plaintiff's termination was the discriminatory one she alleged. (Cf. *Reeves, supra*, 530 U.S. at p. 147.) And there was direct evidence as well. Walner and Siegel both testified that when Coleman solicited their opinions about who should be retained in marketing, they each suggested and praised plaintiff. Coleman's response to them was that plaintiff had "checked out," and there was no reason to consider her. Under the circumstances, that plaintiff was about seven months pregnant and was expected to take her allotted three months' pregnancy leave, Coleman's "checked out" comments could reasonably be understood as referring to some combination of plaintiff's commitment to take the leave, and a temporary diversion of her attention attendant to her condition. In other words, Coleman could be seen as saying that plaintiff's pregnancy and upcoming leave disqualified her for retention. And of course, Walner testified that Coleman directly connected his "checked out" remarks to plaintiff's pregnancy.

Defendant's efforts to disqualify Coleman's statements from discriminatory relevance fail. The claim that he was not the decision maker is, as already stated (*ante*, fn. 1099), extremely tenuous. The notion that his language was too vague or neutral to imply discrimination ignores the context, just discussed. Nor may Coleman's statements be characterized—as a matter of law—as "stray" remarks, unconnected with the process of retention and termination. (See generally *Gibbs v. Consolidated Services* (2003) 111 Cal.App.4th 794, 801 [4 Cal.Rptr.3d 187].)

---

[10] The evidence discussed here actually substantiated two elements. First, it completed plaintiff's prima facie case, which defendant has challenged for lack of a discriminatory showing. It also provided, together with the evidence of falsity of reasons, a sufficient showing of discriminatory discharge to avoid summary judgment. As the cases just cited state, the same evidence of discrimination may serve both purposes.

Defendant also cites the trial court's statement in its "findings" that assuming Coleman's remarks referred to plaintiff's pregnancy, "[they do] not respond to the uncontroverted evidence that plaintiff's position was eliminated by way of consolidation." We have already explained, however, that there was no such "uncontradicted evidence." And even if plaintiff's exact position were determined to have been eliminated, defendant could still face liability if plaintiff was removed from employment because of her pregnancy. (See *Guz*, *supra*, 24 Cal.4th at pp. 357–358.)

■ We therefore hold that the trial court should not have granted summary adjudication of plaintiff's first and second causes of action, for discriminatory discharge based on plaintiff's pregnancy.

### 2. The Retention Bonus Claims.

The trial court also summarily adjudicated as without merit plaintiff's third through sixth causes of action. All of these claims involved or arose from the two-part retention bonus that defendant had awarded plaintiff in October 2000. The court rejected these claims essentially on grounds that plaintiff had been discharged for good cause, namely the economic reduction in force which the court had found the unrebutted cause on the discrimination causes of action. Mindful of our holding that that reason has not been established, we consider the individual causes of action.

The third cause of action alleged that in awarding plaintiff a bonus, the second installment of which would be paid on April 20, 2001, defendant created an implied contract that plaintiff's hitherto at-will employment would continue until at least then, which contract defendant breached by discharging plaintiff in February 2001. In its argument here, plaintiff has alternatively termed the contract a unilateral one, which plaintiff performed by continuing to work for defendant. Relatedly, the fourth cause of action alleged that defendant had breached the employment contract's covenant of good faith by terminating plaintiff before the bonus was payable, to deprive her of it.

The trial court held these claims defeated by defendant's good cause to terminate plaintiff in February. Although the presence or absence of such cause is now an open, triable question,[11] there is another reason why these causes of action were unmeritorious. Plaintiff cannot reasonably assert that the grant of the two-stage bonus represented either an implied promise that defendant would retain her until the second payment came due, or an offer for a new term of employment until then, subject to acceptance by plaintiff's continuing with defendant.

---

[11] Defendant argues that it did not even need good cause to discharge plaintiff, because her employment remained at-will. But an at-will employee may not lawfully be discharged in violation of FEHA, and whether that occurred here is the ultimate issue.

The memo by which defendant extended the bonus did express defendant's desire that plaintiff remain working for it, and provided as an incentive that to receive the two parts of the bonus plaintiff had to "be employed with the company on each of the respective dates . . . ." This may have represented an offer of unilateral contract for the bonus, calling for plaintiff to continue her employment. (See *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 635 [69 Cal.Rptr.2d 300]; *Newberger v. Rifkind* (1972) 28 Cal.App.3d 1070, 1075 [104 Cal.Rptr. 663].) But by no means can it be said, or read, to have included a promise by defendant of continued employment. Plaintiff testified at deposition that this was her understanding.[12]

Accordingly, the third cause of action, based on an untenable claim of an implied or unilateral contract guaranteeing plaintiff employment until at least April 20, 2001, was properly summarily adjudicated. The same is true of the fourth cause of action, which asserted a breach of the covenant of good faith and fair dealing in the same alleged contract. Because defendant alternatively moved for summary adjudication (Code Civ. Proc., § 437c, subd. (f)), it will be entitled to that relief with respect to these claims on remand.

Plaintiff's fifth cause of action alleged that by failing to pay plaintiff her bonus, which she had been promised and had earned, defendant committed both a breach of contract (to pay the bonus) and a violation of Labor Code sections 201 and 2926, which require prompt payment of earned wages after an employee is discharged. Plaintiff sought to recover the bonus, a penalty under Labor Code section 203, and attorney fees under Labor Code section 218.5.[13] The trial court ruled that plaintiff was not entitled to the bonus, because she "was terminated for good cause prior to the bonus date . . . ." Once again, that premise has not here been sustained.

Defendant contends that summary adjudication of this cause of action should be upheld because plaintiff simply was no longer employed by defendant as of April 20, 2001, and therefore was not entitled to the second installment of the bonus, by its terms. However, should plaintiff establish that she was unlawfully terminated in February 2001, she could assert that that termination excused fulfillment of the condition of employment on April 20, and rendered the bonus payable upon termination. (See Civ. Code, § 1440.) Summary adjudication of the fifth cause of action therefore was premature.

---

[12] ". . . Is this statement a promise that I will be working in—that I would be employed on the 20th? No. I don't read that as a promise that I would be employed on the 20th. Rather, I read it as an incentive to please stay until the 20th. That's the way I read it."

[13] Labor Code section 218.5 provides in part: "In any action brought for the nonpayment of wages . . . the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action. . . ."

Finally, plaintiff's sixth cause of action alleged that defendant terminated her to avoid paying wages that were due, including the second bonus installment, and that this termination violated "the fundamental public policy entitling employees to prompt payment of wages due," reflected in Labor Code sections 201 and 2926. The trial court's ruling did not specifically discuss this claim, and defendant supports the ruling only on grounds that plaintiff was not entitled to the bonus. As with the preceding cause of action, the issue of entitlement to the bonus remains unsettled, and therefore the sixth cause of action must presently stand.

In sum, in B167287, the summary judgment and integral summary adjudication must be reversed, except with respect to the third and fourth causes of action.

## THE ORDER DENYING ATTORNEY FEES

After entry of judgment, defendant moved for an award of attorney fees against plaintiff, in excess of half a million dollars, for defending the case. The request for fees was made on two legal grounds: (1) that defendant was entitled, under Labor Code section 218.5, to its fees as the prevailing party on plaintiff's wage-related fifth and sixth causes of action; (2) that under Government Code section 12965, subdivision (b), which provides for attorney fees in the court's discretion, defendant as prevailing party under FEHA should receive its fees, or at least those incurred after McBride's deposition allegedly disclosed that the discrimination claims were meritless. The trial court denied the motion under section 12965, because the discrimination claims had not been frivolous, unreasonable, or groundless, as required (see, e.g., *Jersey v. John Muir Medical Center* (2002) 97 Cal.App.4th 814, 831 [118 Cal.Rptr.2d 807]), and under Labor Code section 218.5, on grounds the fifth and sixth causes were not factually distinct from plaintiff's primary claims.

Defendant's appeal from this order is before us for resolution. But we need not pursue any extended analysis of the parties' contentions.[14] Because, as we have held, defendant should not have been granted summary adjudication of either the discrimination causes of action or the fifth and sixth causes, defendant was not entitled to a fee award under either Government Code section 12965 or Labor Code section 218.5. The order denying attorney fees must therefore be affirmed.

---

[14] We note, however, that plaintiff may well be correct in asserting that the sixth cause of action, as distinguished from the fifth, is not subject to Labor Code section 218.5.

## DISPOSITION

In B167287, the judgment is reversed with respect to defendant, Stamps.com Inc. On remand, the trial court shall enter an order summarily adjudicating as without merit the third and fourth causes of action of the first amended complaint, and otherwise denying defendant's motion for summary judgment or summary adjudication. In B171369, the order denying attorney fees is affirmed. Plaintiff shall recover costs on both appeals.

Boland, J., and Flier, J., concurred.

On January 20, 2006, the opinion was modified to read as printed above. The petition of respondent Stamps.com Inc., for review by the Supreme Court was denied April 12, 2006, S141520. Werdegar, J., did not participate therein.