Filed 1/28/16  Stueland v. Petco Animal Supplies Stores CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| TIFFANY STUELAND,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>PETCO ANIMAL SUPPLIES STORES, INC.,<br><br>        Defendant and Respondent. | D068130<br><br><br>(Super. Ct. No. 37-2013-00072355-CU-WT-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed.


Gould & Associates, Michael A. Gould and Aarin A. Zeif for Plaintiff and Appellant.

Procopio, Cory, Hargreaves & Savitch, Phillip L. Kossy, Kendra J. Hall and Annie Macaleer for Defendant and Respondent.

INTRODUCTION

Tiffany Stueland appeals a summary judgment granted for Petco Animal Supplies Stores, Inc. (Petco) on her complaint for pregnancy discrimination and wrongful termination in violation of public policy. She contends the trial court improperly weighed the evidence. We conclude Petco met its burden of establishing a legitimate nondiscriminatory reason for Stueland's termination: violation of company policies regarding a missing store deposit. We further conclude Stueland failed to meet her burden of raising a triable issue of fact that Petco's reason for termination was pretextual for pregnancy discrimination. We, therefore, affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A

Petco is a retailer of pet supplies. It employs more than 25,000 employees in more than 1,300 locations across the United States, Mexico, and Puerto Rico.

Store deposits are typically taken to the bank daily. At the end of each day, the manager on duty is required to account for all funds, prepare the deposit, and place it into the safe to be taken to the bank the following day. When it is busy or the bank is closed, two or three deposits may be in the safe at a time.

For Petco's operational and financial security, it is important for its managers to "adhere to its policies and procedures regarding the handling of cash and store business receipts and other assets, the preparation and logging of daily bank deposits, timely taking them to the bank, and promptly reporting inaccuracies in the accounting for funds

2

(such as missing deposits)."  A manager who learns about a missing deposit is required to immediately notify the district manager and loss prevention.

Petco's code of ethics states protecting Petco's assets "is every associate's responsibility" and notes loss of assets may be caused by many factors, such as theft of funds as well as intentional or unintentional errors in paperwork.  It states an employee who becomes aware of "any potential loss to Petco . . . [has] an obligation to report it" through the employee's normal chain of command or, if the employee is not comfortable reporting through the chain of command, to report it to human resources, the legal department or a hotline answered by a third party.

## B

Stueland began working for Petco in 2007 at the Trautwein store in Riverside as a cashier.  She was promoted to be the companion animal department manager (CADM) in 2011.  She transferred to the Tyler store in March 2013 after she became engaged to another employee who was a manager at the Trautwein store.  Petco's policy against fraternization required one of them to relocate to another store.  Stueland continued as the CADM at the Tyler store taking care of the reptiles, small animals, and fish as well as their supplies.

## C

Stueland discovered she was pregnant in April 2013 and learned she was having twins in early May 2013.  About three weeks later, when she was in her second trimester, she told her general manager, Laura Nelson, about her pregnancy.  She let Nelson know she was having twins and, since her pregnancy was considered to be high risk, she was

3

going to require more doctors' appointments than with a normal pregnancy. She wanted Nelson to be able to prepare for these appointments.

The only other time Stueland mentioned her pregnancy to Nelson was when she advised her about a doctor's appointment. Stueland reminded Nelson she had an appointment and had prepared a time off request sheet. Nelson commented it was only a request and she might not have the time off for the appointment. When Stueland proposed scheduling the appointment for the morning so she could work the afternoon shift and close the store, Nelson agreed. Stueland thought Nelson was standoffish about the request; however, Stueland was able to attend the appointment.

Stueland felt Nelson's attitude changed toward her after learning about Stueland's pregnancy. Stueland said Nelson became "a little bit more standoffish, sometimes a little bit more rude." Nelson stopped making requests and started making demands. Stueland also said Nelson would not look at her in the office or say "hi or bye." Stueland did not know if Nelson's demeanor was associated with Nelson's own employment issues or Stueland's pregnancy.

Stueland informed another employee of her pregnancy to ask for help with heavy lifting. Stueland's doctor advised her not to lean anything on her abdomen and not to lift anything over 15 pounds. She followed the restrictions and no one gave her any difficulties regarding the restrictions.

After Stueland told Nelson and this other coworker about her pregnancy, all of the managers congratulated her. Another employee, who is still employed with Petco, was pregnant at the same time.

The assistant store manager, Lilia Campos, was very excited about Stueland's pregnancy, asked how she was doing, and made sure she had everything she needed. Campos was very caring and nice. Campos would not let Stueland order animal bedding on her own, but required Stueland to write down the request for Campos to handle. Stueland felt this delayed the shipment and interfered with her work. Stueland stated this occurred both before and after she became pregnant, but she felt Campos became more aggressive about the ordering after Stueland became pregnant.

No one at Petco said anything negative about her pregnancy. The only trouble she felt was Nelson's avoidance and some trouble with Campos regarding ordering. Stueland never submitted a complaint about Nelson's behavior toward her.

D

Stueland closed the store on Saturday, June 1, and Sunday, June 2. She opened the store on Monday, June 3. No one went to the bank on Monday. Another manager, Donald Nunez, closed the store Monday night and observed three deposits in the safe.

The following morning, Nelson opened the store at 6:00 a.m. When Stueland came in at 9:00 a.m., Nelson asked her to go to the bank. Stueland described Nelson as sounding frantic because they were remodeling and resetting the store displays, and Nelson had been tending the register that morning. Nelson sounded like she was in a big rush and asked Stueland to go to the bank as soon as Stueland came into the store.

When Stueland opened the safe, she saw only two deposits and remembered there should have been three. She knew one was missing. Stueland later testified she thought

5

Nelson had the deposit up in the office. However, she did not ask Nelson about the deposit or mention this to anyone at Petco until her deposition.

Stueland knew a missing deposit of approximately $2,000 was a serious issue. She knew company policy required employees to let loss prevention know if they were aware of a missing bank deposit. She knew she should have talked to Nelson about the missing deposit.

However, Stueland did not mention the missing deposit to anyone or think about the deposit again until June 13, 2013, when she received an e-mail asking about a missing deposit for June 1. When Stueland read the e-mail, she and Nunez researched the deposit log and tried to find the deposit slips. The deposit log showed the June 1 deposit was placed in the safe, but there was no entry indicating anyone took it to the bank. Nunez checked the safe to see if it had become stuck, but it was not there. Stueland responded to the e-mail, but thought she was likely to get in trouble because she had taken the other two deposits to the bank and she knew the third one should have been with the other two.

E

Nelson resigned on June 9, 2013, indicating she had accepted a position at another company and provided two weeks' notice. Her last day was June 20, 2013.

On June 18, 2013, Nelson sent an e-mail to human resources regarding a number of staffing issues, which included the fact Campos had also given notice. Nelson expressed concern about sufficient coverage for the store. The e-mail mentioned an employee who wanted to be considered for a promotion in grooming and stated, "she was also interested in becoming a CADM when [Stueland] goes on maternity LOA (which

6

she has stated will be in the next 2 weeks). I would support either position that [Chris Caveney, the district manager] feels would be best to put her in." The e-mail went on to say, "I still have not had any conversation with [Caveney] about my leaving or how the store is going to be covered."

After this e-mail, Caveney, who oversees the Petco stores in the Inland Empire, called and discussed the staffing issues with Nelson. During this conversation, they discussed the fact Stueland was pregnant, her pregnancy was considered to be high risk, she had doctors' appointments coming up, and her doctors said she would be going out early for maternity leave. Nelson asked about covering Stueland's role in the interim.

Stueland saw the June 18, 2013, e-mail from Nelson to human resources stating Stueland was going on maternity leave in two weeks and recommending a person to fill the position during Stueland's leave. She agreed the majority of the June 18, 2013, e-mail had nothing to do with her. However, Stueland stated she had not discussed taking a leave of absence in two weeks and the e-mail upset her. She did not mention it to anyone. Stueland testified she was afraid her job was threatened when she saw this e-mail.

F

Justina Reading, a regional loss prevention manager for Petco, learned about the missing deposit on June 14 or 15, 2013, from an e-mail from the sales audit department. She then had a telephone conversation with Nelson. When she visited the Tyler store on June 20, 2013, she reviewed the deposit log and saw a notation for a bank visit for the

June 1 deposit was missing. She interviewed Stueland and Nunez. Reading and Caveney also talked to Nelson, but determined she was not involved in the missing deposit.

Reading asked Nelson to serve as the witness and take notes for the first part of Stueland's interview. She asked Caveney to witness the remainder of the interview when she learned he was on-site.[1]

At the beginning of the interview, Reading mentioned she did not want to put stress on Stueland because of her pregnancy. Stueland was not visibly pregnant at the time of the interview.

Stueland denied taking the deposit and stated she had no idea what happened to it. She could not offer an explanation as to why she did not notify anyone about the missing deposit. She took the other two deposits to the bank, but remained quiet about the missing deposit.

Reading explained Stueland was wrong in failing to communicate with management about the missing deposit. Stueland acknowledged she should have told her general manager, the district manager or loss prevention when she noticed there was a deposit missing.

After the interview, Reading told Caveney she thought it was probable Stueland took the money. Caveney could not tell, but thought there were obvious policy violations.

---

[1]     Caveney had come to the store that day for a routine visit and because it was Nelson's last day of employment.

Caveney decided to suspend Stueland for a week for her failure to communicate about the missing deposit for over 13 days. He later determined Stueland's employment should be terminated for serious policy violations regarding money handling and reporting of a loss. Petco determined Stueland's role in the missing deposit was egregious enough to warrant termination rather than a final written warning. Stueland was terminated on June 27, 2013. Caveney never had any conversations with Stueland about her pregnancy.

Caveney testified the decision to terminate an employee falls into his hands as the district manager, but they were uncertain about who made the actual call to process the separation. The general manager who processed the separation did not work at the location. The computer system indicates Campos was the initiator of the information about Stueland's termination and a general manager from another store entered the data. The computer indicates the reason for termination was "theft/embezzlement/fraud."

Caveney recommended Nunez receive a final written warning for his role in the missing deposit; however, this did not occur because the paperwork was not processed. Nelson was not disciplined because she left the company. However, Caveney faulted Nelson for failing to notice the missing deposit over a long period of time and indicated he would have disciplined her if she remained with the company. Petco never found the missing deposit.

G

Stueland filed a complaint for discrimination (Gov. Code, § 12940, subd. (a) et seq.) and wrongful termination in violation of public policy alleging she was terminated

9

based on her pregnancy. The trial court granted Petco's motion for summary judgment concluding Petco met its burden of establishing a legitimate, nondiscriminatory reason for terminating Stueland's employment based on her admission she recognized a deposit was missing and she failed to report it as required by her employer's policies. The court also concluded Stueland failed to create a triable issue of fact that her termination was a pretext for pregnancy discrimination. Stueland appeals the judgment after summary judgment.

## DISCUSSION

### I

A defendant is entitled to summary judgment if it establishes a complete defense to the plaintiff's cause of action or shows that one or more elements of the cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) We liberally construe the evidence in support of the party opposing summary

10

judgment (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142), and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under the applicable legal standards. (Cf. *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.)

## II

## A

"California's Fair Employment and Housing Act (FEHA) prohibits an employer from terminating an employee because of her sex. (Gov. Code, § 12940, subd. (a).) 'Sex' within the meaning of the FEHA includes 'pregnancy, childbirth, or medical conditions related to pregnancy or childbirth.' (*Id*., § 12926, subd. (p).) FEHA provisions may provide the policy basis for a claim for wrongful termination in violation of public policy." (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1144.)

To establish a prima facie case of discrimination the plaintiff must provide evidence (1) she was a member of a protected class, (2) she was performing competently in the position she held, (3) she suffered an adverse employment action, and (4) some other circumstance suggesting discriminatory motive. (*Guz*, *supra*, 24 Cal.4th at p. 355; *Rose v. Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, 1421 [age].) An employee alleging discrimination based on pregnancy must show the employer knew she was pregnant and evidence the employer had a pregnancy-discriminatory motive. (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2015) ¶ 7:295, p. 7-63; *Trop v. Sony Pictures Entertainment, Inc.*, *supra*, 129 Cal.App.4th at p. 1145 [must show

11

employer's knowledge of pregnancy]; *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1101 [must show evidence of defendant's pregnancy discriminatory motive].)

When moving for summary judgment, an employer may proceed directly to the second prong of the *McDonnell Douglas*[2] test and present competent, admissible evidence showing it took the challenged action for legitimate, not discriminatory reasons. (*Guz, supra*, 24 Cal.4th at p. 357.) The employer's reasons need not have been wise or correct. Rather, " 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*." (*Id.* at p. 358.)

"Once an employer satisfies its initial burden of proving the legitimacy of its reason for termination, the discharged employee seeking to avert summary judgment must present specific and substantial responsive evidence that the employer's evidence was in fact insufficient or that there is a triable issue of fact material to the employer's motive." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 (*King*).) The plaintiff has the burden of rebutting the employer's showing "by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred." (*Guz, supra*, 24 Cal.4th at pp. 357, 361.) "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Id.* at p. 361.) Thus, "*even after* the plaintiff has presented *prima*

---

[2] *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.

*facie evidence* sufficient to establish an inference of prohibited discrimination in the absence of explanation, and has also presented evidence that the employer's innocent explanation is false, the employer is nonetheless *necessarily* entitled to *judgment as a matter of law* unless the plaintiff thereafter presents *further* evidence that the true reason was discriminatory." (*Ibid*.)

" 'Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . .' " (*Guz*, *supra*, 24 Cal.4th at p. 362.) A court may grant summary judgment for an employer "where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred." (*Ibid.*)

## B

In this case, Petco provided evidence it terminated Stueland for a legitimate reason—an admitted breach of the company's policy for reporting missing funds. Stueland knew a deposit was missing on June 4 when she opened the safe. She knew it was a serious issue and she knew she should have said something to Nelson. However, she remained quiet until she received an e-mail asking for information about the missing deposit.

Stueland did not meet her burden of establishing Petco's reason for termination was pretextual for a pregnancy discriminatory motive. The only evidence Stueland

13

presented of pregnancy discrimination was: (1) Nelson became less friendly toward her after Nelson learned about Stueland's pregnancy (coincidentally around the same time Nelson gave notice of her own intention to leave the company for personal reasons); (2) Nelson mentioned Stueland's pregnancy and her anticipated leave of absence in the June 18 e-mail Nelson sent to human resources and a follow-up telephone call with Caveney regarding staffing issues; (3) Campos became more forceful in requiring Stueland to comply with policies for requesting supply orders; and (4) Reading mentioned in the interview she did not want to put stress on Stueland because of Stueland's pregnancy.

None of this evidence, individually or collectively, raises a rational inference of a pregnancy-discriminatory motive by the decision makers in this case. Stueland's suspicions of improper motives for her termination are based primarily on conjecture and speculation, which is insufficient to create a triable issue of fact. Although the evidence must be viewed in the light most favorable to the plaintiff, the evidence remains subject to scrutiny. A plaintiff's subjective beliefs "do not create a genuine issue of fact." (*King, supra,* 152 Cal.App.4th at p. 433.) The "plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." (*Id.* at pp. 433-434.) "[A] plaintiff's 'suspicions of improper motives . . . primarily based on conjecture and speculation' are not sufficient to raise a triable issue of fact to withstand summary judgment." (*Kerr v. Rose* (1990) 216 Cal.App.3d 1551, 1564.)

Even assuming Nelson harbored some ill will toward Stueland related to her pregnancy, there is no evidence Nelson was a significant participant in the decision to

14

terminate Stueland. Although Nelson witnessed and took notes during the first part of Stueland's interview on Nelson's last day of employment, Nelson did not discuss Stueland's employment with Reading or Caveney and was not involved in the decision to suspend or terminate Stueland. Employment decisions related to loss prevention are not generally made by the general manager at Petco. There is no evidence Reading or Caveney, Nelson's superiors, acted as a conduit for Nelson's alleged prejudice. (See *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.)

Nelson's communications about coverage for Stueland's maternity leave and Reading's brief mention of Stueland's pregnancy at the beginning of the interview do not show a discriminatory motive for termination. Unlike in *Kelly v. Stamps.com Inc.*, *supra*, 135 Cal.App.4th at page 1099, there was no evidence anyone made derogatory remarks about either Stueland's pregnancy or her anticipated leave of absence. There is also no evidence Caveney or Petco's management made the decision to terminate Stueland in the face of exemplary performance commendations. To the contrary, Stueland admitted she knew the deposit was missing and did not report the loss.

Even if the date of the anticipated leave of absence was wrong or false, this does not give rise to a reasonable inference of a discriminatory motive to overcome the legitimate reason for termination proffered by Petco. "[A]n inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination. [Citation.] Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the

15

employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions." (*Guz, supra*, 24 Cal.4th at pp. 360-361.) In this case, there is no indication Petco lied about its reasons for termination. Petco's consideration of staffing for an anticipated leave of absence, whenever it was to occur, does not raise a rational inference of intended discrimination.

Stueland faults Caveney for amending his deposition response to indicate he made the decision to terminate Stueland after initially stating there was uncertainty surrounding who processed the termination. Based on our independent review of the entire record, we cannot conclude Caveney's declaration and his amended deposition are inconsistent. In both instances, Caveney indicated the ultimate decision fell on his shoulders, but there was uncertainty about who completed the termination process in the computer system because of other personnel changes. Even if the statements could be construed as inconsistent, however, there is no evidence anyone who processed the separation harbored a discriminatory motive in processing the termination. Contrary to Stueland's suggestion in her opening brief, there is no evidence Nelson was the person who decided to terminate Stueland or that she was a significant participant in the employment decision. To the contrary, the evidence shows Caveney made the decision independently to suspend and terminate Stueland based on the investigation. (*Lakeside-Scott v.*

16

*Multnomah County* (9th Cir. 2009) 556 F.3d 797, 805.)[3]  The only other individuals involved in processing the separation were a general manager from another store and Campos, the person who had been kind and caring about Stueland's pregnancy, but expected her to follow the protocol for ordering supplies.

There is a difference between the computer notation that Stueland was terminated for "Theft/Embezzlement/Fraud" related to a missing deposit and Caveney's statement he decided to terminate Stueland for serious policy violations related to money handling as to the same missing deposit. However, these are not incompatible or fundamentally different justifications and do not show Petco's proffered legitimate reason for termination was pretextual for discrimination.  (See *Horn v. Cushman & Wakefield Western* (1999) 72 Cal.App.4th 798, 815 [the substance of the reason provided, not the word choice, is critical].)

Stueland also contends the different treatment she received in the investigation and in discipline from Nelson and Nunez supports an inference of a discriminatory motive. We conclude such an inference is speculative and not based on the evidence.  Petco interviewed Nunez, the only other manager involved in the deposits.  They also talked to Nelson and ruled out her involvement.  In fact, Stueland testified Nelson would not have had any reason to open the safe on the morning of June 4.  These other individuals were not similarly situated.  There is no evidence either of these other individuals knew a

---

3    "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."  (*Guz, supra*, 24 Cal.4th at p. 354.)

deposit was missing on June 4 and remained quiet until questioned by the sales audit department. In contrast, Stueland admitted she knew a deposit was missing, she knew it was a serious issue, she knew she should have discussed it with her manager, and she failed to do so. Petco's investigation by neutral company personnel was " 'appropriate under the circumstances' and provided [Stueland] 'a fair opportunity to present [her] position and to correct or contradict relevant statements prejudicial to [her] case.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 875, fn. 21, citing *King, supra,* 152 Cal.App.4th at pp. 439-440.) It is pure speculation to suggest a difference in how Stueland was interviewed and disciplined was not based on Petco's proffered legitimate reason, but was pretextual for pregnancy discrimination.

Finally, the fact Stueland was terminated after she informed Petco she was pregnant does not give rise to a discriminatory motive. Evidence of temporal proximity alone is not sufficient to avoid summary judgment. "[T]emporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual. . . . Instead, an employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual." (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1112-1113.) Stueland has not met this burden.

18

DISPOSITION

The judgment is affirmed.  Petco shall recover its costs on appeal.


                                                    McCONNELL, P. J.

WE CONCUR:


HALLER, J.


McINTYRE, J.