Filed 3/30/15  Schulz v. Sutter East Bay Hospitals CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAFAEL SCHULZ,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>SUTTER EAST BAY HOSPITALS,<br><br>　　　　Defendant and Appellant. | A136276, A137208<br><br>(Alameda County<br>　Super. Ct. No. RG11590831) |

This is a joint appeal following the trial court's decisions to grant a motion for summary judgment filed by defendant Sutter East Bay Hospitals (the Hospitals), but to deny their subsequent motion to recover attorney fees, in an employment action brought by plaintiff Rafael Schulz.  Plaintiff, a former employee, sued the Hospitals for wrongful termination in violation of public policy and discrimination on the basis of gender and national origin.  The Hospitals thereafter moved for summary judgment on the ground that no triable issue of material fact existed with respect to whether plaintiff had been wrongfully discharged with discriminatory intent or in violation of a public policy.  Rather, the Hospitals argued that the undisputed evidence proved plaintiff voluntarily resigned from his employment following a fair investigation by his supervisor that revealed several legitimate concerns regarding his ability to competently discharge his work duties.  The trial court granted this motion and entered judgment in the Hospitals' favor, yet thereafter found no basis for awarding them attorney fees.  For reasons set forth

1

below, we affirm the judgment, albeit on legal grounds other than those relied upon by the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

On August 16, 2011, plaintiff, an adult male of Peruvian ancestry, filed an employment lawsuit against his former employer, the Hospitals, asserting two causes of action – to wit, race, gender, national origin and ancestry discrimination under the Fair Employment and Housing Act, Government Code section 12900 et seq., and wrongful termination in violation of public policy. This lawsuit arose from the following series of events.

On August 16, 2010, plaintiff was hired by Marion Dixon to work as a supervisor in the Health Information Management ("HIM") Department at the Alta Bates Summit Comprehensive Cancer Center (the Cancer Center), a division of the Hospitals. In this position, Dixon, Manager of Operational Support Services at the Cancer Center, was plaintiff's immediate supervisor, and Kathy Troutner, Director of the Cancer Center, was in turn Dixon's immediate supervisor. Several individuals worked under plaintiff, including two HIM Leads, Althea Valrey and Mark Malixi.

On December 9, 2010, Valrey and Malixi approached Dixon to discuss certain concerns that had arisen regarding plaintiff. Specifically, certain female employees in the HIM Department had complained that plaintiff's habit of "standing over them and staring" while they worked made them "uncomfortable." Valrey and Malixi identified to Dixon the following employees as having these concerns: Judith Greene, Angel Zheng, Antoinette Cutrer and Maria De Los Angeles. Later, in deposition testimony, De Los Angeles denied having any problem with plaintiff and Zheng testified that plaintiff's conduct only bothered her once, and that she had no other problems with him. The other two female employees, Cutrer and Greene, were not deposed, however they were contemporaneously interviewed by Dixon with regard to their complaints.

The following day, December 10, 2010, Dixon met with plaintiff to discuss the HIM employee's concerns. Plaintiff acknowledged that, as part of "his process," he on occasion would stand silently behind his subordinates to observe and monitor their work.

2

Dixon advised plaintiff his approach when monitoring his subordinates was "awkward," and that he should strive to give each employee a "3 foot personal space" zone to ensure their "privacy and comfort level." Dixon instructed plaintiff to perform rounds with other managers "to help him learn" a more appropriate method for monitoring other employees. The substance of this meeting, which plaintiff does not dispute, was later documented by Dixon.

Dixon went on vacation from January 14 through January 24, 2011, during which time she placed plaintiff in charge of the HIM Department. Dixon instructed plaintiff to keep a journal covering work-related events during her absence. Dixon then met with plaintiff on January 25, 2011, her first day back at the office, during which he reported that no significant incidents or problems had occurred during her absence. However, during their meeting, Pam Fisher, the Infusion Manager, approached Dixon to advise her of an incident during which one of plaintiff's subordinates, Charles Jones, had openly challenged his authority during a staff meeting, which insubordination plaintiff did not correct. Nonetheless, when Dixon returned to plaintiff and asked him whether any specific personnel issues had surfaced, he responded in the negative.

Ultimately, however, plaintiff acknowledged the incident of Jones' insubordination had occurred, and that he did not report it in the journal that Dixon instructed him to keep in her absence.[1] Dixon told plaintiff that his failure to immediately address the issue with Jones was "significant error," and directed him to meet with Jones to discuss it. Plaintiff thereafter attempted to draft a disciplinary document for Jones, which Dixon ultimately revised herself.

On January 28, 2011, just days after Dixon learned of the incident of Jones' insubordination, plaintiff emailed her stating: "Jennifer [Barrera] is absent today. No phone call received from her. No communication at all. Going to her office and

---

[1] Dixon independently verified the insubordination by interviewing other employees in attendance at the meeting. Plaintiff later testified that he "did not feel that Charles Jones did anything that merited formal documentation," although he acknowledged Jones "engaged in disruptive conduct" at the meeting.

3

checking status." An unexcused absence would have placed Barrera on "Final Warning" status. However, when Dixon spoke to Barrera the following work day, Barrera insisted she had in fact left a message with plaintiff regarding her absence. Initially, plaintiff continued to insist no call had been made. However, later, upon inspecting plaintiff's mobile phone, Dixon realized Barrera had left him a message that she was absent due to illness.

Also on January 28, 2011, Dixon met with plaintiff regarding a significant HIM Department project relating to migration of the hospital's transcription service. During this meeting, plaintiff acknowledged to Dixon that, although he had dialed into a conference call regarding this project, he was "not really listening to the information." Dixon expressed her disappointment and warned plaintiff that such conduct was not acceptable. Plaintiff later claimed not to recall this specific incident.

Later that same afternoon, plaintiff called Dixon to report that he had engaged in a verbal "fight" with another of his subordinates, Philip Grace, explaining: "He yelled at me and I yelled louder." According to plaintiff's own notes of the incident, he told Grace, "You are not leaving my office in that way. You ask authorization to leave the office." Then, when Grace asked to leave, plaintiff complied with his request. In addition to plaintiff, Dixon was advised of this verbal altercation by other employees who had overheard it. Dixon also learned from some of these employees that plaintiff was still upsetting certain subordinates by "staring" and "standing too close" to them.

On January 31, 2011, Dixon met with plaintiff to advise him that his work performance was under investigation. During this meeting, they again discussed his method of observing and monitoring his subordinates' work. Plaintiff later testified that he admitted to Dixon that, on occasion, he would approach his employees quietly and "watch them for some period of time." Plaintiff also admitted that Dixon had warned him in December 2010 that individuals had complained that he stood too close while monitoring them, and that she had instructed him to stay "at least three feet away from people."

4

However, on this occasion, Dixon was more straightforward in discussing plaintiff's conduct. Dixon called plaintiff's approach in monitoring other employees, "weird," and told him he exhibited a lot of "bravado." In addition, she told him his appearance was "macho." More specifically, plaintiff recalled that Dixon took on a "bitter" facial expression, puffed her chest, and "then walking while swinging her arms 'from side to side' . . . ask[ed] with an exaggerated Spanish accent whether he had 'bravado' and was a 'maccccho,' " deliberately elongating her word. Later the same day, Dixon went to plaintiff's office to advise him that Troutner was involved in the investigation into his work performance.

The next day, February 1, 2011, plaintiff was called to a meeting with Dixon, Troutner and a representative from the Human Resources department. The major topic of discussion was Dixon's investigation into the concerns expressed by plaintiff's subordinates regarding his discomforting conduct when monitoring their work. Dixon stated that "[his] behavior poses a threat" to her and the HIM Department, and that there was "overwhelming information" demonstrating his "inappropriate behavior," including his harassing and staring at other employees. She then said: "This might pose a threat to your ability to continue with your employment."

At the end of this meeting, Troutner advised plaintiff that they had determined management needed to take action regarding his conduct. Troutner then told him that his presence was "not the best for the department," and that he had three days to make a choice: he could remain in his current position with a note regarding the allegations and findings of Dixon's investigation in his employment record, or he could resign.

On February 4, 2011, a Friday, plaintiff met alone with Dixon, during which time Dixon asked whether he had decided to resign. When plaintiff advised Dixon that he had decided to stay, she became angry, told him the situation was "not positive," and then forcefully told him she wanted him to resign. Reluctantly, plaintiff then agreed to resign before leaving her office. A few hours later, Dixon called plaintiff to ask that he quickly submit a resignation letter, telling him to make the verbiage "positive." By about 3 p.m., plaintiff complied with her requests, submitting a letter to Human Resources providing

5

30 days notice of his resignation. Plaintiff's resignation letter, which he emailed to Dixon, stated as follows:

"Dear Marion,

"I am writing to inform you that I will be resigning from my job as the HIM Manager for the Cancer Center at Alta Bates Summit Medical Center. This resignation will be effective 30 days after acceptance. [¶] I regret any misunderstandings that took place. You have been a great manager and a dedicated partner, Marion. The HIM department and the coding team are on a path forward with a lot of potential for the future. I have many ideas on how to help that take place and would like to be a part of that effort. If there's an opportunity in the future, I would be very happy to discuss our options. [¶] "Please extend my greetings to Kathy Troutner. [¶] Again, it was a pleasure to work with you and I sincerely wish this letter were not necessary.

"Rafael Schulz."[2]

The following Monday, February 7, 2011, at about 2:15 p.m., Dixon gave plaintiff his final paycheck and told him he was "done," even though the 30-day notice period had not passed. According to plaintiff, when he responded that he had never had a problem like this with an employer, Dixon stated, "This is Berkeley." Dixon then waited while plaintiff collected his belongings before directing him to leave by the back door. A few hours later, she called to instruct him not to call the Cancer Center or any of its employees again.

When plaintiff was later deposed, he was asked whether he believed Dixon was a racist. Plaintiff responded: "Well, from deep in my heart, she's not a racist." Plaintiff also confirmed that neither Dixon nor anyone else told him what to write in his resignation email or letter, agreeing that the "words," "concepts and ideas" were entirely his own. Finally, plaintiff acknowledged that, during his employment, he never

---

[2] Plaintiff delivered a similar, signed resignation letter later the same day, stating, among other things: "My working experience in this office has been excellent. Marion had been a great manager, mentor, and a dedicated business partner."

6

complained about Dixon because: "Why should I complain? There was no reason to complain of nothing."

On February 28, 2012, the Hospitals filed their motion for summary judgment. On June 1, 2012, following a contested hearing, the trial court granted this motion, finding that plaintiff had failed to make a prima facie showing that he had been subjected to an adverse employment action. The court reasoned: "Plaintiff does not allege any conduct on the part of Ms. Dixon that would cause a reasonable employee to believe that she would ultimately terminate him if he refused to resign voluntarily." Judgment in favor of the Hospitals was, thus, entered on June 18, 2012.

On November 21, 2012, the trial court denied the Hospitals' motion for attorney fees pursuant to Government Code section 12965, subdivision (b), after rejecting their argument that plaintiff's lawsuit was vexatious, frivolous and meritless. Both parties timely appealed the trial court's adverse rulings.

## DISCUSSION

Plaintiff challenges the trial court's decision to grant the Hospitals' summary judgment motion. He reasons that triable issues of material fact exist regarding whether he involuntarily resigned based upon his manager's (to wit, Dixon's) discriminatory animus and use of misinformation against him, and whether Dixon forced his involuntary discharge in light of her animus towards his gender or Peruvian nationality.

The Hospitals, in turn, ask that we affirm the judgment in their favor, arguing that the trial court properly granted summary judgment based on plaintiff's failure to offer competent evidence showing disputed issues of material fact in support of his wrongful termination and discrimination claims, including the essential threshold fact that he was subjected to an adverse employment action. In addition, the Hospitals bring a separate challenge to the trial court's denial of their request for an award of attorney fees. In doing so, they argue that plaintiff's lawsuit was meritless and vexatious from the start given the clear, undisputed fact that he voluntarily resigned from his job and, thus, suffered no adverse employment action, an essential element of his claims. We address each contention in turn below.

7

## I. Rules Governing Review of the Trial Court's Summary Judgment Ruling.

Summary judgment may be granted "if it is contended that the action has no merit . . . ." (Code Civ. Proc., § 437c, subd. (a).) A defendant moving for summary judgment has met the burden of showing that a cause of action has no merit if that party "has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).) See also *Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 168-169 (*Teselle*).)

"We review an order granting or denying a motion for summary judgment de novo, examining the evidence before the trial court. We independently determine the effects of that evidence as a matter of law. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 161, 163 [80 Cal.Rptr.2d 66].) 'In undertaking our independent review of the evidence submitted, we apply " ' "the same three-step process required of the trial court: First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citations.]" ' " ' (*Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 392 [134 Cal.Rptr.2d 689].)" (*Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 601-602.)

"In performing our review, we view the evidence in a light favorable to the losing party . . . , liberally construing h[is] evidentiary submission while strictly scrutinizing the

8

moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859.) However, " '[w]hen discovery, properly used, makes it "perfectly plain that there is no substantial issue to be tried" [citation], section 437c, Code of Civil Procedure, is available for prompt disposition of the case.' " (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21.) Moreover, when considering whether summary judgment is appropriate, "admissions against interest have a very high credibility value." (*Id*. at p. 22.)

## II. The Trial Court's Decision to Grant Summary Judgment in Favor of Defendant.

Here, as stated above, plaintiff asserts two causes of action, the first for discrimination on the basis of gender and national origin under the Fair Employment and Housing Act, Government Code section 12900 et seq. (FEHA), and the second for wrongful termination in violation of public policy.[3] (See *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 176.)

In cases alleging employment discrimination, whether under FEHA or the common law, the plaintiff bears the initial burden of proving a prima facie case. (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 354 (*Guz*).) A prima facie case of employment discrimination is proved where: (1) the plaintiff was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action (such as termination, demotion, or denial of an available job), and (4) some other circumstance

---

[3]   FEHA is designed to further the public policy that "[e]mployment practices should treat all individuals equally, evaluating each on the basis of individual skills, knowledge and abilities and not on the basis of characteristics generally attributed to [protected groups]." (Cal. Code Regs., tit. 2, § 11006.) As such, FEHA prohibits "an employer, because of . . . national origin, . . . [or] gender . . . of any person, . . . to discharge a person from employment, [or] discriminate against the person in compensation or in terms, conditions, or privileges of employment . . . ." (Gov. Code, § 12940, subd. (a).) Similarly, "[t]he central assertion of a claim of wrongful termination in violation of public policy is that the employer's motives for terminating the employee are so contrary to fundamental norms that the termination inflicted an injury sounding in tort." (*Roby v. McKesson Corp*. (2009) 47 Cal.4th 686, 702.)

suggests a discriminatory motive. (*Guz, supra,* 24 Cal.4th at pp. 354-355; see also *Deschene v. Pinole Point Steel Co*. (1999) 76 Cal.App.4th 33, 44; *Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1252 (*Turner*).) If the plaintiff makes this prima facie showing, the burden shifts to the employer to rebut the presumption "by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason. [Citations.] . . . [¶] If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] . . . The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Guz, supra,* 24 Cal.4th at pp. 355-356.)

The burden-shifting in employment discrimination cases is somewhat altered where, as here, the employer moves for summary judgment. In such cases, the employer must show either that the plaintiff cannot establish one or more elements of his prima facie case, or that one or more legitimate, nondiscriminatory and nonretaliatory reasons motivated its allegedly adverse employment action. (*Guz, supra*, 24 Cal.4th at p. 356; *Kelly v. Stamps.com Inc*. (2005) 135 Cal.App.4th 1088, 1097-1098.) If the employer meets this initial burden, the burden then shifts to the plaintiff to produce substantial evidence that the employer's stated nondiscriminatory and nonretaliatory reason for the adverse employment action was untrue or pretextual, or evidence the employer acted with a discriminatory or retaliatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination or intentional retaliation. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*); see also *Yanowitz v. L'Oreal USA, Inc*. (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)

In our case, the trial court granted the Hospitals' summary judgment motion after finding that plaintiff failed to establish a prima facie case for discrimination because he did not suffer any adverse employment action; rather, he voluntarily resigned. As such,

10

issues relating to the nature of the Hospitals' proffered reasons for discharge were never reached. On appeal, plaintiff contends the trial court erred by failing to consider all of the evidence in a light most favorable to him, and by improperly weighing conflicting evidence, when finding that no adverse employment action occurred. In particular, plaintiff contends the court failed to view in a light most favorable to him evidence tending to show that his resignation was demanded or otherwise compelled by Dixon, rather than voluntary. As discussed below, we agree with plaintiff that there is a triable issue of fact as to whether he suffered an adverse employment action, such that the burden fell upon the Hospitals to show one or more legitimate and nondiscriminatory reasons motivated the action against plaintiff. (*Guz, supra*, 24 Cal.4th at p. 356.)

### A.    Adverse Employment Action against Plaintiff.

Under California law, an adverse employment action for purposes of an employment discrimination claim is one that materially affects the terms, conditions, or privileges of employment. Otherwise stated, such action is one that is "reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." (*Yanowitz, supra,* 36 Cal.4th at p. 1054.) Moreover, where, as here, the plaintiff does not allege to have been actually discharged, but rather "constructively" so, the following standard applies:

"Under the cases, an employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Turner, supra,* 7 Cal.4th at pp. 1246-1247.)

However, in setting forth this standard, the California Supreme Court cautioned that " ' "[an] employee may not be unreasonably sensitive to his [or her] working environment . . . . Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from . . . unreasonably harsh

11

conditions, in excess of those faced by his [or her] co-workers. He [or she] is not, however, guaranteed a working environment free of stress." ' [Citation.] "In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable. In general, '[s]ingle, trivial, or isolated acts of [misconduct] are insufficient' to support a constructive discharge claim. (Silver, Public Employee Discharge and Discipline (1989) § 1.5, p. 1-13.)"[4] (*Turner, supra,* 7 Cal.4th at pp. 1246-1247 [footnotes omitted]. See also *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 387 ["while the employee and the public have a significant interest in preventing discrimination," the employer and the public also have "a legitimate interest in efficient, cost-effective, and high-quality work"] [*McRae*].)

Thus, "to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would

---

[4]     Plaintiff argues that *Turner* does not apply because, in this case, a manager "directly" requested his resignation. Instead, plaintiff asks us to apply *Knappenberger v. City of Phoenix* (9th Cir. 2009) 566 F.3d 936, 941, a federal case holding that, where it appears an employer's conduct in requesting or obtaining an employee's resignation "effectively deprived [him] of free choice" (for example, where the employee was threatened with the loss of pension benefits), the resignation may be deemed involuntary. Nonsense. The undisputed facts demonstrate that plaintiff "reluctantly resigned" at his supervisor's request, after his supervisor's boss offered him the choice to resign or to stay in his current position with a negative notation in his employment record. Clearly, this is a case of constructive, not actual, termination. Were it otherwise, the record would include some evidence of plaintiff having been given notice that he was being terminated from his position. There is none. Accordingly, *Turner* is controlling. (*Turner, supra,* 7 Cal.4th at pp. 1244-1245 ["Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will"]. See also *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [California appellate courts are bound to follow California Supreme Court authority].)

12

realize that a reasonable person in the employee's position would be compelled to resign."[5] (*Turner, supra*, 7 Cal.4th at p. 1251.)

Here, plaintiff's constructive discharge is based on the following set of facts: (1) At a February 1, 2011 meeting to discuss the results of an investigation into plaintiff's work performance prompted by complaints Dixon received from female employees regarding his methods of observation, Troutner gave plaintiff a choice to either resign or stay in his current position with a note in his record regarding the investigation.[6] (2) During this same meeting, Dixon described plaintiff as a "threat" to her and the rest of the HIM Department. (3) Dixon then met alone with plaintiff on February 4, 2011 and, when plaintiff told her he intended to stay in his position, she got upset and "assertively" or "forcefully" asked him to resign, insisting she "wanted [him] to resign." (4) Plaintiff "reluctantly resigned" due to Dixon's conduct, after which she told him to immediately submit a "positive" letter giving 30-day notice of resignation. (5) Plaintiff complied with Dixon's request to submit his notice of resignation under her constant pressuring, whereupon she told him the following workday to leave immediately, rather than after 30 days, and directed him to the back door.[7] (6) When plaintiff told Dixon before leaving

---

[5] Thus, "the standard by which a constructive discharge is determined is an objective one ─ the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' [Citation.]" (*Turner, supra*, 7 Cal.4th at p. 1248.)

[6] As we will discuss in more detail below, plaintiff disputes certain of these investigatory findings, while acknowledging or ignoring the bulk of them. Among others, he acknowledges the facts that he failed to report misconduct by a subordinate, Charles Jones, that occurred while Dixon was on vacation; made an erroneous report of unexcused work absence with respect to another subordinate, Jennifer Barrera; and engaged in a verbal "fight" with a third subordinate, Philip Grace. With respect to the complaints about his conduct in observing employees' work, plaintiff challenges this fact with respect to one of the identified individuals, Maria De Los Angeles; contends another individual, Angel Zheng, complained just once; and fails to dispute the fact as to the two remaining individuals, Judith Greene and Antoinette Cutrer.

[7] In their initial brief, the Hospitals make much of plaintiff's reliance in his factual recitation on "Exhibit 1," a document he prepared summarizing in his own words the key events surrounding his resignation. The Hospitals argued that this document is not

13

the building that he had never had a problem like this with an employer, she responded, "This is Berkeley."

In addition to these events occurring in early February 2011, plaintiff relies upon certain conduct by Dixon that preceded Troutner's instruction to either resign or stay employed with a note in his record regarding the investigation, which he contends "heightened the aggravated circumstances" and "openly demonstrat[ed] discriminatory intent against [him] because he is male and Latino." Specifically, plaintiff identifies the "offensive display Dixon put on by standing, puffing her chest and mocking [him], and then describing him with a Spanish-accent as a 'maccccho' who exhibits bravado." According to plaintiff, Dixon's conduct, occurring shortly before his resignation, on January 31, 2011, was "part of a design to cause him to resign which she revealed by expressing her intent that he resign."

Having considered plaintiff's evidentiary showing, we agree a triable issue of fact exists as to whether he suffered an adverse employment action. In doing so, we acknowledge, as the Hospitals point out, that Troutner gave plaintiff a choice to either resign or remain in his position with a note in his employment record regarding Dixon's investigation. We also acknowledge language in *Turner* stating that, where an employee's resignation was "simply one rational option," the resignation was not coerced, even where the employee dislikes or feels penalized by one of his or her options. (*Turner, supra*, 7 Cal.4th at pp. 1246-1247, 1255 ["a single negative performance rating does not amount to a constructive discharge. 'In order to properly manage its business,

competent evidence to oppose summary judgment because it was never verified. At the same time, the Hospitals insisted they were "free to use the admissions contained in Exhibit 1 because [plaintiff] testified at deposition that he believes the writing to be accurate." After plaintiff noted in his reply brief that the Hospitals never objected to his reliance on Exhibit 1 in the trial court and, indeed, that the Hospitals themselves extensively relied upon the document when deposing him, the Hospitals acknowledged in their own reply brief that "the admissibility of Exhibit 1 is a Red Herring (because the document supports [their] position in this litigation) . . . ." Given these circumstances, and in light of our own conclusion that nearly all key facts in this case are undisputed (rather, the dispute centers on the *significance* of these facts), we find no need to further address Exhibit 1's admissibility.

14

every employer must on occasion review, criticize, demote, transfer, and discipline employees' "].) However, in this case, the so-called "choice" presented by Troutner must be considered in proper context. As the record reflects, after Troutner offered this choice on February 1, 2011, Dixon arguably took it away by the words and actions she directed against plaintiff just days later. As described above, on February 4, 2011, Dixon asked whether plaintiff intended to resign and, when he responded in the negative, she then "assertively," "forcefully," and "angrily" told him she "wanted [him] to resign." This, of course, all followed Dixon's conduct on January 31, 2011, whereupon she "mock[ed] [plaintiff's] mannerisms by standing up and 'puffing her chest' and then walking while swinging her arms 'from side to side' and asking with an exaggerated Spanish accent whether he had 'bravado' and was a 'maccccho.' " And, adding further context to the purported choice Troutner gave plaintiff, just hours after he "reluctantly" agreed with Dixon's insistence that he resign, she called to instruct him to quickly submit a resignation letter and to make the verbiage "positive." Plaintiff complied with her instruction by 3 p.m. the same day, submitting a letter providing 30-day notice of his resignation to Human Resources.[8] Nonetheless, at about 2:15 p.m. the next workday, Monday, February 7, 2011, Dixon gave plaintiff his final paycheck and told him he was "done," even though the 30-day notice period had not passed. According to plaintiff, when he responded that he had never had a problem like this with an employer, Dixon stated, "This is Berkeley." Dixon then waited while plaintiff collected his belongings before directing him to leave by the back door. A few hours later, she called to instruct him not to call the Cancer Center or any of its employees again.

Under the totality of these circumstances, we conclude that a triable issue of fact exists as to whether plaintiff suffered an adverse employment action. Simply put, while the record is indeed clear that, at least on February 1, 2011, plaintiff was given a choice

---

[8] As set forth above, while Dixon advised plaintiff to immediately submit a "positive" letter giving 30-days notice of his resignation, plaintiff acknowledges that he chose his own words and ideas for his resignation letters, including the highly complimentary words he used to describe Dixon, without input or pressure from Dixon or anyone else. (See pp. 5-6, *ante*.)

15

by Troutner to stay or leave his position, the record is much less clear as to whether this choice was subsequently revoked by Dixon. And while the Hospitals correctly note that Troutner was the head of the Cancer Center at Alta Bates Summit Medical Center and, thus, had decision-making authority over Dixon, the record is also undisputed that Dixon had independent authority to hire and fire certain employees, including plaintiff. As such, reasonable minds could disagree on this record as to whether Troutner's decision to give plaintiff the choice to stay employed at the Cancer Center was, in effect, rendered void by Dixon's words and conduct designed to further her own preference that he resign. Accordingly, a triable issue of fact exists as to whether, as plaintiff argues, his work environment was "so intolerable or aggravated at the time of [his] resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner, supra*, 7 Cal.4th at p. 1251.)

### B. Legitimate Reasons for Seeking Plaintiff's Resignation.

However, our inquiry does not end here. Having rejected the trial court's finding that plaintiff failed to make a prima facie showing of having suffered an adverse employment action, we must continue to the next issue, which the trial court never reached. Specifically, as explained above, once the plaintiff makes this prima facie showing, the burden shifts to the employer to establish that one or more legitimate, nondiscriminatory and nonretaliatory reasons motivated its allegedly adverse employment action.[9] (*Guz, supra*, 24 Cal.4th at p. 356; *Kelly v. Stamps.com Inc., supra,*

---

[9] We reject plaintiff's argument that this burden-shifting test does not apply because there is direct evidence of discrimination in this case – to wit, Dixon's words and actions on January 31, 2011, when she "mock[ed] [his] mannerisms by standing up and 'puffing her chest' and then walking while swinging her arms 'from side to side' and asking with an exaggerated Spanish accent whether he had 'bravado' and was a 'macccho.' " (See *Guz, supra*, 24 Cal.4th at p. 354 ["This so-called *McDonnell Douglas* [*Corp. v. Green* (1973) 411 U.S. 792] test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained"].) Viewed objectively, Dixon's conduct, including describing him as "macho," asking whether he had "bravado," and using a fake accent, does not amount to

16

135 Cal.App.4th at pp. 1097-1098.) Here, the Hospitals identify the following legitimate, nondiscriminatory reasons for its allegedly adverse employment action against plaintiff. (See *Guz, supra*, 24 Cal.4th at p. 356; *Kelly v. Stamps.com Inc., supra*, 135 Cal.App.4th at pp. 1097-1098.)

First, on December 9, 2010, Valrey and Malixi reported to Dixon that certain female employees in the HIM Department (to wit, Judith Greene, Angel Zheng, Antoinette Cutrer and Maria De Los Angeles) had complained that plaintiff's habit of "standing over them and staring" while they worked made them "uncomfortable." The following day, Dixon met with plaintiff to discuss these concerns, and instructed him to strive to give each employee a "3 foot personal space" zone to ensure their "privacy and comfort level," and to perform rounds with other managers "to help him learn" a more appropriate method for monitoring employees. Despite these instructions, in late January 2011, Dixon learned from one or more HIM department employees that plaintiff was still upsetting certain female subordinates by "staring" and "standing too close" to them.

Second, when Dixon went on vacation from January 14 through January 24, 2011 and placed plaintiff in charge of the HIM Department, he violated her instructions to keep a journal of significant work-related events during her absence. Specifically, although plaintiff reported to Dixon that no significant incidents or problems had occurred during her absence, Pam Fisher, the Infusion Manager, subsequently advised her that one of

---

unambiguous national origin or gender discrimination. Rather, her conduct, while offensive, belittling or obnoxious, may or may not reveal discriminatory animus, such that the *McDonnell Douglas* test is indeed applicable to determine whether discrimination was her true motivation. (See *Serri v. Santa Clara University, supra*, 226 Cal.App.4th at p. 868 [rejecting the contention that an employer's remarks to a Puerto Rican employee that her shawl looked like a poncho and that he preferred her hairstyle when she blew her curly hair dry because it looked more relaxed and professional constituted direct evidence of discriminatory animus].)

17

plaintiff's subordinates, Charles Jones, had openly challenged his authority during a staff meeting, and that plaintiff had not corrected him.[10]

Third, on January 28, 2011, plaintiff emailed Dixon to report that "Jennifer [Barrera] is absent today. No phone call received from her. No communication at all. Going to her office and checking status."[11] However, when Dixon spoke to Barrera the following work day, Barrera insisted she had in fact left a message with plaintiff regarding her absence. Dixon later confirmed Barrera left this message by checking plaintiff's phone.

Fourth, on the same day, Dixon met with plaintiff regarding a significant HIM Department project relating to migration of the hospital's transcription service, during which meeting plaintiff acknowledged that, although he had dialed into a conference call regarding the project, he was "not really listening to the information." Dixon expressed her disappointment and warned plaintiff that such conduct was not acceptable. Plaintiff later claimed not to recall this incident.

Fifth, and also on the same day, plaintiff reported to Dixon that he had engaged in a verbal "fight" with another of his subordinates, Philip Grace, explaining: "He yelled at me and I yelled louder." Plaintiff's own notes of the incident indicate that he told Grace, "You are not leaving my office in that way. You ask authorization to leave the office." When Grace then asked to leave, plaintiff complied with his request. Dixon was independently told of this incident by other employees who had overheard it.

According to the Hospitals, these incidents triggered Dixon's decisions to investigate plaintiff and to call a meeting with plaintiff, Troutner and a Human Resources

---

[10]   Plaintiff later acknowledged that this incident of insubordination had occurred, and that he failed to report it in the journal that Dixon instructed him to keep in her absence. Dixon also independently verified this insubordination by interviewing other employees in attendance at the meeting. Dixon told plaintiff that his failure to immediately address the issue with Jones was "significant error," and directed him to discuss it with Jones. Plaintiff thereafter attempted to draft a disciplinary document for Jones, which Dixon later had to revise.

[11]   An unexcused absence would have placed Barrera on "Final Warning" status.

18

representative on January 31, 2011. Plaintiff insists this investigation was illegitimate and its findings exaggerated. However, the record reflects that, while plaintiff disputes certain of the alleged incidents of his poor work performance, he ultimately acknowledges or ignores the bulk of them. For example, plaintiff acknowledges the facts that he failed to report misconduct by a subordinate, Charles Jones, that occurred while Dixon was on vacation; made an erroneous report of an unexcused work absence with respect to another subordinate, Jennifer Barrera; and engaged in a verbal "fight" with a third subordinate, Philip Grace. With respect to the complaints about his conduct in observing employees' work, plaintiff challenges this fact with respect to one of the identified individuals, Maria De Los Angeles; contends another individual, Angel Zheng, complained just once; and fails to dispute the fact as to the two remaining individuals, Judith Greene and Antoinette Cutrer.[12]

Given this undisputed record of more than one legitimate and nondiscriminatory reasons for Dixon's adverse work action against plaintiff, we conclude the Hospitals have successfully rebutted the presumption of discrimination with admissible evidence sufficient to raise a triable issue of fact. (*Guz, supra*, 24 Cal.4th at pp. 355-356.) The burden thus shifts back to plaintiff to produce substantial evidence that the proffered reasons are in fact false or pretextual, that the Hospitals acted with a discriminatory motive, or a combination of the two, such that a reasonable trier of fact could conclude plaintiff was the victim of intentional discrimination. (See *Hersant, supra,* 57 Cal.App.4th at p. 1005; *Guz, supra,* 24 Cal.4th at p. 356.)

### C.    Evidence of Pretext or Discriminatory Motive.

Under California law, pretext may be demonstrated with evidence " ' "that a discriminatory reason more likely motivated the employer" ' " or that " ' "the employer's proffered explanation is unworthy of credence." ' " (*Morgan v. Regents of University of*

---

[12]    In deposition testimony, De Los Angeles denied having any problem with plaintiff and Zheng testified that plaintiff's conduct only bothered her once, and that she had no other problems with him. The other two female employees, Cutrer and Greene, were not deposed, however they were interviewed by Dixon with regard to their complaints.

19

*California* (2000) 88 Cal.App.4th 52, 68 (*Morgan*).)  Evidence that "the employer's decision was wrong, mistaken, or unwise" is insufficient to make this showing.  (*Id.* at p. 75.)  Rather, to establish pretext, the employer's proffered reasons must be so weak, implausible, inconsistent, incoherent, or contradictory "that a reasonable factfinder could rationally find them 'unworthy of credence." (*Ibid.*  See also *McRae, supra,* 142 Cal.App.4th at p. 396 [an employee's speculation or personal belief that proffered reasons are implausible is insufficient to demonstrate pretext].)

"Proof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons. [Citation.] Still, there must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions. [Citation.] Accordingly, the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th at p. 361.)

Returning to our case, as reflected in our discussion above, we have no doubt the Hospitals' proffered reasons for seeking plaintiff's resignation are worthy of credence. Indeed, plaintiff himself acknowledges several of the incidents triggering Dixon's investigation into his work performance, including his failure to report or address employee insubordination and her receipt of complaints from female employees that his managerial style made them uncomfortable.  (Pp. 17-20, *ante*.)  We thus are left with the issue of whether there is nonetheless sufficient evidence in the record to permit a reasonable inference that the adverse employment action against him was in fact motivated by employer discrimination.  (See *Guz, supra*, 24 Cal.4th at p. 361.)  Plaintiff's evidentiary showing in this regard consists of the following:  Before Dixon angrily sought his resignation, she revealed discriminatory intent by "mocking [his] mannerisms by standing up and 'puffing her chest' and then walking while swinging her arms 'from

side to side' and asking with an exaggerated Spanish accent whether he had 'bravado' and was a 'maccccho.' "

As noted above, we cannot accept plaintiff's contention that Dixon's conduct was direct evidence of discriminatory intent; rather, her motivation when mocking plaintiff in this manner is ambiguous. (P. 17, fn. 9, *ante*.) Nor can we conclude that Dixon's conduct on the day in question supports "a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions." (See *Guz, supra*, 24 Cal.4th at p. 361.) Indeed, plaintiff himself admitted that, "deep in [his] heart," he did not consider Dixon to be racist and that, aside from the events of the January 31 and February 4, 2011, he considered her an excellent boss and mentor and would work for her again should the opportunity arise. (Compare *Dee v. Vintage Petroleum, Inc*. (2003) 106 Cal.App.4th 30, 37 [a supervisor's remark that "it is your Filipino understanding versus mine" was an ethnic slur sufficient to establish a triable issue regarding the existence of a abusive work environment].) Given this evidence, as well as the multitude of valid reasons Dixon had for seeking plaintiff's resignation based on his deficient work performance, we conclude the record as a whole, including the evidence of her offensive conduct on January 31, 2011, is not sufficient to permit a rational inference that her actual motive was discriminatory. Otherwise stated, plaintiff's indirect evidence of discrimination, while perhaps sufficient to establish a prima facie case of discrimination, fails to establish a material issue of fact regarding discriminatory animus in light of the Hospitals' strong showing that the decision to seek his resignation was wholly justified. (See *Hersant, supra*, 57 Cal.App.4th at p. 1005 ["the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [the asserted] non-discriminatory reasons' "]; see also *Serri v. Santa Clara University, supra*, 226 Cal.App.4th at p. 861.)

21

Accordingly, we conclude the Hospitals were properly granted summary judgment based upon the failure of plaintiff to meet his burden to produce substantial responsive evidence demonstrating the existence of a material triable controversy with respect to pretext or discriminatory animus on the part of his employer.

## III. The Trial Court's Refusal to Award Attorney Fees to the Hospitals.

Finally, we address the trial court's refusal to award the Hospitals attorney fees, a decision reviewed only for abuse of discretion. (*Bond v. Pulsar Video Productions* (1996) 50 Cal.App.4th 918, 921 (*Bond*).)

The following legal standards are not in dispute. "In actions brought under [FEHA], the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs, including expert witness fees, except where the action is filed by a public agency or a public official, acting in an official capacity." (*Bond, supra,* 50 Cal.App.4th at pp. 921-922; see also Gov. Code, § 12965, subd. (b) (hereinafter, § 12965(b).) More specifically, an award of attorney fees may be appropriate under § 12965(b) when a plaintiff's FEHA action is determined to be "unreasonable, frivolous, meritless, or vexatious." (*Bond, supra,* 50 Cal.App.4th at pp. 921-922.) For purposes of this rule, "meritless" means an action that is "groundless or without foundation." (*Id.* at p. 922) "Vexatious," in turn, may be found where the plaintiff "brought or continued such a claim in *bad faith*," however, "[the] plaintiff's subjective bad faith" is not a necessary prerequisite to an award of attorney fees to the prevailing defendant. (*Id.* at pp. 922, 925.)

Here, the Hospitals argue the court should have granted their attorney fee request because plaintiff not only initiated his lawsuit in bad faith in light of his knowledge that he voluntarily resigned from employment, but he and his attorneys then continued to prosecute the lawsuit in bad faith, even after plaintiff's deposition made clear the lack of any evidence of his resignation being forced. In addition, the Hospitals contend plaintiff "unreasonably compounded the attorneys' fees associated with discovery by insisting [they] produce irrelevant documents containing patient data, which [they] had to pay to review."

Having considered the Hospitals' arguments in this regard, we conclude on this record there is no basis for finding the trial court abused its discretion in declining to award them attorney fees. While we have affirmed the trial court's decision to grant summary judgment to the Hospitals due to plaintiff's inability to prove an essential element of his claims (to wit, pretext or discriminatory intent), this decision does not mean that plaintiff's causes of action were brought in bad faith or were wholly lacking in merit. The evidence of Dixon's conduct in mocking plaintiff's mannerisms and Peruvian accent, and her palpable anger at his initial decision not to resign, were sufficient to create at least a bare suspicion that Dixon was acting with discriminatory intent when seeking his resignation. As such, plaintiff's contention that he was a victim of discrimination on the basis of his gender or national origin – while inadequate to survive summary judgment – cannot be deemed frivolous, vexatious, unreasonable or wholly without merit. At a minimum, this evidence weighs substantially against any conclusion that plaintiff brought this action for reasons other than a good faith belief that he was wrongfully discharged. (See *Rosenman v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro* (2001) 91 Cal.App.4th 859, 873-874 ["where the plaintiff presents a colorable claim, and particularly where the adverse jury verdict is less than unanimous, such an award is inappropriate in light of the very strong public antidiscrimination policy embodied in FEHA. Any other standard would have the disastrous effect of closing the courtroom door to plaintiffs who have meritorious claims but who dare not risk the financial ruin caused by an award of attorney fees if they ultimately do not succeed"].)

Accordingly, for all of the reasons stated, the trial court's refusal to award attorney fees to the Hospitals was a proper exercise of discretion and, thus, must stand.

## DISPOSITION

The trial court's judgment, including its denial of defendants' motion for attorney fees, is affirmed. Each party to bear his own costs.

                                 _____

                                 Jenkins, J.

We concur:

_____

McGuiness, P. J.

_____

Pollak, J.