Filed 5/22/25  Venegar v. Dignity Health CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GENE VENEGAR, | D085385 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVDS1707026) |
| DIGNITY HEALTH, | |
| Defendant and Respondent. | |

APPEAL from a judgment and orders of the Superior Court of San Bernardino County, Khymberli S. Y. Apaloo and Thomas S. Garza, Judges.  Affirmed in part and reversed in part.

Law Offices of Mann & Elias and Imad Y. Elias for Plaintiff and Appellant.

Cole Pedroza, Kenneth Pedroza, Scott M. Klausner, Law + Brandmeyer, Yuk K. Law, and Zachary Schwake for Defendant and Respondent.

Gene Venegar was employed as a licensed vocational nurse by Dignity Health, doing business as Community Hospital San Bernadino (the Hospital).  For many years, Venegar worked with mental health patients in the Hospital's behavioral health services unit.  Unlike every other part of the

Hospital, patients in the behavior health unit were permitted cigarette breaks, and Venegar was assigned to supervise these breaks. Although he complained that exposure to second-hand smoke aggravated his respiratory disorder, the Hospital continued to assign him this responsibility. Later, it revised his seniority date and reduced his hours.

Eventually, Venegar filed a lawsuit against the Hospital alleging various causes of action and claiming, among other things, discrimination, retaliation, and a failure to accommodate his health condition. The trial court rejected most of these claims when it granted the Hospital's motion for summary adjudication. A jury found in favor of the Hospital on the one remaining cause of action. Appealing from the final judgment, Venegar now challenges the trial court's order granting summary adjudication of five causes of action as well as the jury's verdict.

We agree with Venegar that there are triable issues of fact on his claims for disability discrimination, failure to engage in a good faith interactive process, retaliation and intentional infliction of emotional distress. Although the Hospital maintains it accommodated Venegar's disability in 2014, Venegar presented evidence that the Hospital was aware of his respiratory disorder as early as 2010 and yet continued to assign him to supervise patients on cigarette breaks. Additionally, although the Hospital argues it reduced Venegar's work hours in 2014 consistent with its longstanding policy to reset employees' seniority when they change employment status, Venegar nevertheless provided evidence that raises a triable issue as to whether the policy was merely a pretense for retaliating against him based on his complaints about exposure to cigarette smoke. The trial court erred in dismissing these four claims.

2

Because there is no evidence that Venegar was discriminated against based on his age, we affirm the trial court's decision to grant summary adjudication of that claim.  Finally, we affirm the jury's verdict on his cause of action for failure to accommodate his disability because there is substantial evidence supporting the jury's finding on causation.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    *Venegar's employment at the Hospital*

In 2002, Venegar began working per diem as a licensed vocational nurse in the behavioral health unit of the Hospital.  Patients in that unit were among the most at-risk patients at the facility.  They were often homeless, indigent and faced complex mental health conditions.  As a licensed vocational nurse in the unit, Venegar administered medications, got patients ready for breakfast, sat with them during visits with doctors, completed discharge assessments, and processed admissions.

In the behavioral health unit, patients were permitted cigarette breaks several times per day on an outside patio.  When patients were smoking on the patio, a minimum of two staff members had to be outside with them.  There were no requirements as to which specific level of professional—registered nurse, licensed vocational nurse, or mental health worker—need to accompany the patients.  Generally, the charge nurse would direct whoever

---

[1]    Because the primary focus of this appeal is the trial court's summary adjudication ruling, we state the undisputed material facts in the light most favorable to Venegar, the summary judgment opponent, without considering evidence to which objections were made and sustained.  (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.)  We will recite the relevant facts applying a different and more deferential standard of review when we consider Venegar's challenge to the jury's verdict.  (*Post,* pp. 20–26.)

was available to go outside during the smoke breaks.  Venegar never volunteered, but was often directed to attend patients while they smoked.

**B**.    *Venegar's breathing disorder*

In 2008, Venegar began experiencing shortness of breath and coughing. Two years later, he went to the emergency room because he was "having difficulty breathing to the point where" he felt he "needed to get some help." Following this incident, Venegar spoke to the Hospital's safety director about the possibility of prohibiting smoking on the patio.  The safety director agreed to submit his request to a management committee but never got back to him. In May 2010, Venegar filed an unsafe condition report about secondhand smoking, and suggested solutions to end smoking by patients at the hospital. In it, he recommended that the Hospital stop providing cigarettes to patients and instead offer alternatives like nicotine patches or gum.

Venegar repeatedly complained to managers and supervisors about the health dangers associated with smoking and attending to patients while they smoked on the patio.  In August 2010, Venegar objected in writing to policies forcing him to be with patients on the patio while they smoked, noting that he would not go out on the patio during smoke breaks due to his "health issues."  Nevertheless, the charge nurses directed him to accompany the patients during smoke breaks on the patio.  Hospital personnel generally responded to Venegar's complaints by stating the Hospital was "working on" making the campus entirely "smoke free."  Venegar's manager also told him, "If you don't like it, get another job."

**C.**    *Venegar becomes a full time employee, but his work shifts are repeatedly cancelled*

In February 2014, Venegar transitioned from per diem to full-time employment.  Shortly thereafter, the Hospital began cancelling Venegar's

shifts pursuant to the Hospital's mandatory call-offs practice. The Hospital called Venegar off on a near daily basis because it had a relatively low number of patients in the behavioral health unit.

These "call-offs" were dictated by the collective bargaining agreement, which required that staffing be adjusted in line with state-mandated nurse-to-patient ratios. When fewer patients were in the unit, fewer nurses were needed, and call-offs occurred in the order of "departmental" seniority. According to Venegar, licensed vocational nurses, often with less experience and less seniority, were scheduled to work when he was called off.

Venegar complained to the Hospital's director and manager about his shifts being cancelled, and he was directed to the human resources director. In May 2014, the director explained that the behavioral health unit had a longstanding unwritten policy to change an employee's seniority date for purposes of mandatory call-offs to the date they switched from per diem to full time status. According to the Hospital, because of this policy, Venegar had lower departmental seniority than the other full time licensed vocational nurses even though he had been a nurse at the Hospital for a much longer period of time.

The Hospital explained that Venegar's seniority was adjusted when his status changed and he became a full-time employee. Because he was the newest full-time licensed vocational nurse, the Hospital called him off work before others who had higher departmental seniority. No one Venegar asked at the Hospital had ever heard of this policy.

D.  *The Hospital and Venegar agree to an accommodation*

In May 2014, Venegar filed a formal grievance regarding his daily call-offs and took medical leave for stress-related anxiety, which he associated with having so many cancelled shifts. While initially set for one month,

5

Venegar's leave was extended due to other health issues, including his breathing disorder. Venegar also submitted a request for accommodation, supported by a doctor's note stating that he should avoid exposure to cigarette smoke due to bronchospasm. Initially, the Hospital refused to accommodate Venegar's work restrictions and gave him a note stating it was "unable to accommodate."

In September 2014, the Hospital reversed course and permitted Venegar to return to work when its employee relations representative approved his work restrictions. The Hospital provided Venegar with an employee health recertification form, which confirmed that he would not be required to accompany patients on smoking breaks but would still be responsible for responding to emergencies as part of his essential job duties. Venegar signed an acknowledgement of the accommodation form.

After Venegar returned to work, however, the Hospital continued to cancel his shifts while allowing other licensed vocational nurses with less overall seniority to work. Venegar had never heard of this happening regularly to anyone else and believed the Hospital was doing it because he complained about being forced to accompany patients on smoking breaks. He thought charge nurses were complaining to Venegar's managers about his refusal to go out on the smoking patio.

E.    *The Hospital abandons its unwritten seniority policy*

In December 2016, after learning the Hospital had a new human resources director, Venegar once again filed a grievance about the practice of calling him off based on his adjusted departmental seniority date. In January 2017, the new human resources director told Venegar and his union representative that the Hospital would revert to using his date of hire as his seniority date. The new director gave no explanation for why Venegar's

6

seniority date was changed in the first place, nor why it was now being reverted to his hire date. Following this change, Venegar was no longer called-off.

Even after Venegar returned to work, and after the Hospital's employee health manager purportedly agreed to abide by his doctor's requested work restrictions, charge nurses continued to direct Venegar to supervise patients on the smoking patio. This occurred regularly until January 2017. Venegar then presented the Hospital with another doctor's note reiterating that he could not be around cigarette smoke. Around the same time, Venegar's cardiologist told him that he had developed hypertension at work.

In February 2018, Venegar experienced a near heart attack that required the insertion of a stent. He retired in November 2018.

## F.    *The Lawsuit*

In April 2017, Venegar filed a civil complaint against the Hospital, asserting five causes of action under the Fair Employment Housing Act (FEHA), Government Code section 12940,[2] for: (1) discrimination based on a disability; (2) failure to provide a reasonable accommodation; (3) failure to engage in a good faith interactive process to determine a reasonable accommodation; (4) retaliation; (5) age discrimination; and an ancillary cause of action for (6) intentional infliction of emotional distress.

Venegar's accommodation claims alleged that the Hospital failed to offer a reasonable accommodation or engage in an interactive process. He asserted that the Hospital initially agreed to accommodate his request to avoid exposure to secondhand smoke, but then failed to honor the

---

[2]    The FEHA prohibits unlawful employment practices by employers, which is defined by any person regularly employing five or more persons or any person acting as an agent of an employer, directly or indirectly. (Gov. Code, § 12926, subd. (d).)

7

accommodation.  Venegar also contended that his work hours were unlawfully reduced after he sought this accommodation. His disability discrimination claim attributed the reduction in hours to disability-related animus; his retaliation claim asserted his hours were reduced in retaliation for requesting an accommodation, and his age discrimination cause of action claimed the reduction was unlawfully based on his age.  Finally, his cause of action for intentional infliction of emotional distress was based on the same alleged conduct.

1.    *Summary Adjudication*

The Hospital moved for summary judgment or, alternatively, summary adjudication.  The court denied summary judgment by finding that unresolved factual issues regarding Venegar's accommodation request, particularly concerning his exposure to second-hand smoke, warranted further examination.  But the court granted summary adjudication on the claims for disability discrimination, failure to engage in an interactive process, retaliation, age discrimination, and intentional infliction of emotional distress.  It found that the Hospital had legitimate, nondiscriminatory reasons for reducing Venegar's hours, that the adverse actions occurred before the Hospital was aware of Venegar's accommodation requests, and that the Hospital's actions did not rise to the level required to recover for emotional distress or punitive damages.

2.    *Trial*

The case proceeded to trial on Venegar's claim that the Hospital failed to accommodate his respiratory disorder.  In support, Venegar testified about his experience working in the behavioral health unit and his exposure to secondhand smoke during patient supervision breaks.  According to Venegar,

8

it was this exposure to cigarette smoke that caused his health problems and ultimately forced him to stop working.

Venegar's primary care physician testified that he believed secondhand smoke was a contributing factor to Venegar's physical health issues. His psychology expert testified about the emotional toll of his work conditions, including that he had an adjustment disorder, depressed mood, and anxiety, which he attributed to the Hospital's failure to accommodate his health concerns. His economic expert provided calculations for lost wages based on the assumption that his heart attack and subsequent retirement were a direct result of the Hospital's actions.

The Hospital's cardiology expert testified that Venegar's heart attack was caused by longstanding and poorly managed risk factors, including high blood pressure and elevated cholesterol, rather than any exposure to secondhand smoke at work. The Hospital also introduced medical records from a treating psychiatrist showing that Venegar experienced symptoms of the adjustment disorder, depressed mood, and anxiety several months before he requested an accommodation. Additionally, it highlighted evidence that, in December 2017, Venegar told his pulmonologist that he planned to retire within a year, which was consistent with when he did retire.

Ultimately, the jury returned a verdict in the Hospital's favor. Specifically, the jury found that the Hospital's failure to accommodate Venegar's disability was not a substantial factor in causing his alleged harm.

## DISCUSSION

### A. *Claims Resolved on Summary Adjudication*

Summary judgment/adjudication is granted when a moving party establishes the right to entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to

provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

A defendant moving for summary judgment or adjudication must demonstrate there is no merit to a cause of action by showing that one or more elements cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subds. (o)(1), (o)(2); *Aguilar, supra,* 25 Cal.4th at p. 845.) If the defendant makes such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of one or more material facts as to that cause of action or as to a defense to the cause of action. (*Aguilar*, at pp. 850–851.) If the plaintiff does not make such a showing, judgment in favor of the defendant is appropriate. To obtain summary adjudication, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action . . . ." (*Id.* at p. 853.)

In reviewing a summary adjudication order, we analyze "the record and the determination of the trial court de novo." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) A court considering a motion for summary adjudication must view the evidence and reasonable inferences from the evidence in the light most favorable to the opposing party, as on a motion for summary judgment. (*Aguilar, supra*, 25 Cal.4th at p. 850.) We independently examine the record on appeal to determine whether triable issues of material fact exist, " 'considering all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' " (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1530.)

10

1. *Disability Discrimination Claim*

In the employment discrimination context, case law has refined this burden-shifting analysis to incorporate the three-stage *McDonnell Douglas* test used to adjudicate federal discrimination claims. (See *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097–1098; *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1004–1005 (*Scotch*).) Under the *McDonnell Douglas test*, the plaintiff at trial bears the initial burden to establish a prima facie case of discrimination; if the plaintiff is successful, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for its actions; and, if the employer produces evidence of a legitimate reason, the burden shifts back to the plaintiff to show the employer's reason was a pretext to mask an illegal motive.[3] (*Guz,* at pp. 354–356; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*); *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 662; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67–68.) But applying the test on an employer's motion for summary judgment or summary adjudication requires that we "account for the procedural posture of the case." (*Mackey v. Board of Trustees of California State University* (2019) 31 Cal.App.5th 640, 662 (*Mackey*).) We explained in *Mackey* that the employer "[a]s the party seeking summary judgment . . .

---

[3]     The *McDonnell Douglas* test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

' "has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse . . . action was based upon legitimate, nondiscriminatory factors.' " (*Ibid.*, quoting *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861; see also *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344.) Where the employer meets its initial burden, " 'the plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." ' [Citations.] Circumstantial evidence of ' "prete[xt]" must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate' on an improper basis. [Citations.] With direct evidence of pretext, ' "a triable issue as to the actual motivation of the employer is created even if the evidence is [only slight]." ' " (*Morgan, supra*, 88 Cal.App.4th at pp. 68–69.)

a.    *There is a factual dispute as to when the Hospital had notice of Venegar's respiratory disorder.*

There is no question that Venegar had a respiratory disorder, although the Hospital argues it did not know about this medical issue before August 2014, which was six months after the Hospital reduced his hours.  (See *Morgan, supra*, 88 Cal.App.4th at p. 74 [without knowledge of appellant's protected activity, the decisionmakers "could not have acted in retaliation for appellant's filing of the grievance"].)  To the contrary, however, we conclude there is at least a factual dispute as to when Venegar disclosed his disability to the Hospital and requested accommodation.

In 2008, Venegar spoke to the Hospital's safety director "about the possibility of prohibiting smoking on the patio."  The Hospital told Venegar

12

that he would submit his request "to the committee," but he "never heard back." In May 2010, he filed an unsafe condition report "about the second hand smoking, and suggested solutions to end smoking by patients." He further stated, "Staff required to remain with patients while they smoke. Non-smoking patients, staff and visitors are complaining of exposure to second-hand smoke." He recommended, "Discontinue smoking in [the behavioral health unit]. Offer alternatives to smoking such as nicotine-[patches], gum or other options. Discontinue providing cigarettes to patients."

When asked in his deposition what prompted him to make his recommendation in the report, he testified, "Because of the way I was feeling. I was getting sick from all the cigarette smoke." Venegar "continuously complained" to his "managers and supervisors about the health dangers associated with smoking and attending to patients while they smoked on the patio." In 2010, "I had objected in writing to that policy forcing me to be with patients on the patio while they smoked. . . . I always complained about being exposed to smoking, to all of my supervisors."

Specifically, in August 2010, the Hospital distributed "a memo regarding the smoking policy" at the behavioral health unit. Venegar "signed an acknowledgement of this memo" and informed the Hospital that he "refused to go on the patio during smoke breaks." He wrote on the acknowledgement form he provided to the Hospital that, "*due to my health issues* I do not agree" there must be a minimum of two staff on the patios with the patients at all time. (Italics added.) He specifically advised the Hospital that he "will not be on patio during smoke break." On another Hospital acknowledgement form he wrote, "Agree to all directives except"

13

that there must always be a minimum number of the staff on the patios with the patients "*due to my health issues re: smoking*." (Italics added.)

These statements advising the Hospital of Venegar's "health issues re: smoking," along with his other complaints about secondhand smoke and requests for accommodation, were at least arguably sufficient to put the Hospital on notice that he has a disability that needs to be accommodated. (*Gelfo v. Lockheed Martin Corp*. (2006) 140 Cal.App.4th 34, 62 ["Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation."])

Moreover, in January 2011, Venegar's "annual health screening form noted that [Venegar] reported a persistent cough." On the form provided to the Hospital, the "Yes" box was checked next to "persistent coughing" with "2nd hand smoke" handwritten next to that. This form further alerted the Hospital that Venegar "suffered from" a respiratory "condition that qualified as a disability under [FEHA]." (*Avila v. Continental Airlines, Inc*. (2008) 165 Cal.App.4th 1237, 1249; *Prilliman v. United Air Lines, Inc*. (1997) 53 Cal.App.4th 935, 954 [rejecting "suggestion that the disabled employee must first come forward and request a specific accommodation before the employer has a duty to investigate such accommodation"].)

While it is certainly true that an employee must in some way communicate to the employer the existence of a pertinent health condition in order to trigger the obligation to provide appropriate accommodations (see *King v. United Parcel Service, Inc*. (2007) 152 Cal.App.4th 426, 444; *see also Wentworth v. Regents of University of California* (2024) 105 Cal.App.5th 580, 603), here there is more than sufficient evidence that Venegar notified the Hospital of his respiratory disorder and requested an accommodation as early

14

as 2010. (*Schmidt v. Safeway Inc.* (D.Or. 1994) 864 F.Supp. 991, 997 [to be subject to protection under the statute, "[t]he employee need not mention the ADA or even the term 'accommodation.' "] Specifically, following numerous complaints to Hospital employees about the health effects of secondhand smoke during his shifts and requesting that smoking be discontinued, he then communicated to the Hospital on forms in 2010 and 2011 that he had "health issues" with "smoking," including a "persistent cough" related to "2nd hand smoke." He requested an accommodation in refusing to agree that there must always be a minimum of two staff members on the patio with the patients and he specifically stated that he "will not be on patio during smoke break." (*Lin v. Kaiser Found. Hosps.* (2023) 88 Cal.App.5th 712, 728 ["when an employer is aware of a further reasonable accommodation that is needed, the employer has a duty to consider that accommodation even if the employee does not explicitly request it"].)

Venegar's statements create a triable issue as to when he gave notice to the Hospital of his respiratory disorder and communicated the need for an accommodation.

b.    *There is a factual dispute as to whether the Hospital's justification for reducing Venegar's hours was pretextual.*

The Hospital produced "admissible evidence sufficient to raise a genuine issue of material fact the employer took its actions for a legitimate, nondiscriminatory reason." (*Scotch, supra,* 173 Cal.App.4th at p. 1004.) Specifically, the Hospital produced a declaration from its director of behavioral health services and deposition testimony of its human resources director that it was the Hospital's "standing practice" that "every time an employee's status changes, whether they go full-time to per diem, per diem to full-time, that the employee's department seniority changes." Once the

15

Hospital produced its evidence, Venegar was required to "adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred." (*Scotch, supra*, 173 Cal.App.4th at p. 1005.) "In determining whether these burdens were met, we must view the evidence in the light most favorable to plaintiff, as the nonmoving party, liberally construing [his] evidence while strictly scrutinizing defendant's." (*Ibid*.)

In response to the Hospital's showing, Venegar produced several different items of evidence, indicating that: (1) neither the Hospital's human resources director nor anyone else was able to identify another employee (other than Venegar) whose seniority date was changed pursuant to this alleged policy; (2) the alleged policy was not in writing; (3) Venegar was never told of the policy before his seniority was recalculated; (4) there was no evidence that any other employees were aware of the policy; and (5) ultimately, the Hospital reversed course and adjusted his seniority to the earlier date. The sum of this evidence was sufficient to raise a triable issue as to whether the supposed policy was merely a pretense.

At her deposition, the human resources director was unable to "recall" whether she had seen the practice of changing the seniority date with other employees. Additionally, Venegar was "never told about this so-called policy," or that his "seniority date would change" when he became a full time employee. He "asked everyone around" him and "no one had ever heard of this so-called policy." He was "neither given nor could [he] find any written form of this so-called policy." (*See Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851–852 [affidavits opposing motion are "liberally construed, and doubts . . . should be resolved in favor of the party opposing the motion"].)

16

Moreover, in January 2017, the Hospital abruptly changed its policy and reverted to basing Venegar's seniority on his original date of hire in 2002. After learning that the Hospital had a new human resources director, Venegar filed another grievance regarding the practice of cancelling his shifts based on his adjusted seniority date. He and his union representative then met with the new human resources director, who told them that the Hospital would "revert" to using his "date of hire" as his seniority. The human resources director "gave no explanation for why" his seniority was initially changed or "why it was now being reverted" to his hire date. Considering this abrupt change of policy along with the other evidence, there is a triable issue as to whether the Hospital's policy was pretextual.

2. *Good Faith Interactive Process Claim*

FEHA prohibits employers from failing "to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation." (Gov. Code, § 12940, subd. (n).) "Both employer and employee have the obligation 'to keep communications open' and neither has 'a right to obstruct the process.' [Citation.] 'Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information[,] which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.' " (*Scotch, supra*, 173 Cal.App.4th at p. 1014.) Thus, " 'the employer cannot prevail on summary judgment . . . unless it establishes through undisputed facts that . . . the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the

17

employee failed to engage in discussions in good faith.' " (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 598 (*Soria*).)

The Hospital argues the evidence compels a conclusion that it engaged in a timely interactive process to determine whether reasonable accommodations were available. We disagree. We have already concluded there is a factual issue as to whether the Hospital was on notice of Venegar's respiratory disorder in 2010. If the Hospital knew of his health issues in 2010 and did not respond to his request for an accommodation until 2014, there is, at a minimum, a factual question as to whether it engaged in the interactive process in a timely manner. The trial court should not have granted summary adjudication of this claim.

3.    *Retaliation Claim*

To establish a prima facie case of retaliation, "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz, supra*, 36 Cal.4th at p. 1042; Gov. Code, § 12940, subd. (h).)

For the reasons discussed above, Venegar has presented sufficient evidence to survive summary judgment on his retaliation claim. There is a factual dispute as to whether the Hospital's unwritten seniority policy was pretextual and whether the Hospital retaliated against Venegar for requesting an accommodation.

4.    *Intentional Infliction of Emotional Distress Claim*

"The elements of the tort of intentional infliction of emotional distress are: ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional

18

distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct . . . ' Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) Liability " ' " 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051.) "[C]laims for intentional infliction of emotional distress in the employment context may be asserted where the actionable conduct also forms the basis for a FEHA violation." (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 97–101.)

The Hospital argues that its actions do not rise to the level of egregious behavior necessary to establish intentional infliction of emotional distress. (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 80 ["If personnel management decisions are improperly motivated, the remedy is a suit against the employer for discrimination."].) Although this is a close question, for purposes of summary adjudication there is a factual question as to whether the Hospital was aware of Venegar's breathing disorder in 2010 and whether it purposely reduced his hours and failed to accommodate his condition until 2014. The trier of fact could conclude that the Hospital's conduct was extreme and outrageous, taken for purposes of retaliation prohibited by FEHA, and intended to cause Venegar emotional distress. Triable issues of fact therefore preclude summary adjudication on this claim.

5. *Age Discrimination Claim*

To make out a prima facie case of age discrimination under the FEHA, there must be evidence that the plaintiff (1) is over the age of 40, (2) suffered an adverse employment action, (3) was performing satisfactorily at the time of the adverse action, and (4) suffered the adverse action under circumstances

19

that give rise to an inference of unlawful discrimination based on age. (Gov. Code, § 12940; *Hersant v. California Department of Social Services* (1997) 57 Cal.App.4th 997, 1002–1003; see *Guz, supra*, 24 Cal.4th at pp. 354–355).

The record here does not show that Venegar experienced any adverse action tied to his age during his employment. He has not, for example, identified any younger employee who received more favorable treatment, nor has he provided evidence that he was replaced by a significantly younger person. Because Venegar failed to provide evidence that he suffered any age discrimination, the trial court was correct to grant summary adjudication of this claim.

## B.  *Claims Resolved at Trial—Failure to Accommodate*

Trial was held on Venegar's remaining cause of action for failure to accommodate his disability. He argues that the jury's verdict was not supported by substantial evidence.

"When an appellant challenges the sufficiency of the evidence in support of the jury's factual findings, the substantial evidence standard of review applies." (*TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1102.) This standard requires that " 'we resolve "all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict." ' " (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251.) "The 'power of the appellate court is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, that will support the verdict.' " (*Ibid.*)

"It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) "This burden is a 'daunting' one." (*Ibid.*) "Reversal for insufficient

evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury verdict." (*Quintero v. Weinkauf* (2022) 77 Cal.App.5th 1, 5.)

Venegar claims that the Hospital's failure to accommodate his breathing disorder caused him physical, emotional, and economic harm. The jury instructions addressed the required elements for the cause of action, including harm and causation. Although the jury specifically found that Venegar had a disability and that the Hospital failed to provide him with reasonable accommodations, it also determined that the Hospital's failure to accommodate was not a substantial factor in causing him harm. The jury's negative answer to the question on the special verdict form[4] meant they found no proven connection between the Hospital's conduct and any of the various types of harm that Venegar claimed. We conclude that substantial evidence supports the jury's conclusion as to each.

1.    *Physical Harm*

Dr. Franck Juste, an internal medicine specialist, testified that he had been Venegar's primary care doctor for approximately 15 years. Dr. Juste opined that secondhand smoke exposure was a substantial cause of the arterial blockage that led Venegar to receive a stent in February 2018. He acknowledged, however, that Venegar had several other significant risk factors for the near heart attack he suffered, including sustained high blood pressure and cholesterol levels that were "off the chart" and "dangerous." He also admitted that his assessment of the connection between Venegar's

---

4    The jury answered "no" to the question, "Was [Hospital's] failure to provide reasonable accommodation a substantial factor in causing harm to Gene Venegar?"

21

symptoms and secondhand smoke was based on what Venegar reported to him during office visits.

Dr. Daniel Wohlgelernter, the Hospital's expert cardiologist, provided evidence from which the jury could have concluded that secondhand-smoke exposure was not a substantial factor in causing Venegar's near heart attack. He testified that, to a reasonable degree of medical probability, the main contributors to Venegar's cardiac issues were his longstanding, poorly controlled high blood pressure and high cholesterol, which had been present for years. According to Dr. Wohlgelernter, Venegar's exposure to secondhand smoke was "limited," "outdoors, in a patio with an open roof, exposed to open air," "just intermittent, a few times a week, for a short period of time, 30 minutes," and "pales in comparison to his problems with high blood pressure and high cholesterol." "[H]is artery blockage in his heart was due to his very high cholesterol and his very high blood pressure. His prediabetes also was a factor. The secondhand smoke was not a significant contributing factor." While exposure to smoke was not ideal, according to Wohlgelernter it was not a significant factor in the context of the more serious risk factors that were in play.

Dr. Nitanth Vangala testified as an interventional cardiologist who treated Venegar in February 2018 when he visited the emergency room after experiencing chest pain and shortness of breath. He performed an angiogram, which revealed "a near total blockage of the main artery of his heart." Dr. Vangala placed a stent to open the blockage and restore blood flow. He acknowledged Venegar had multiple uncontrolled risk factors, including high cholesterol, prediabetes, hypertension, and stress, all of which substantially contributed to his condition. And while he maintained that secondhand smoke was a factor, he conceded it was difficult to quantify its

impact compared to these other significant risk factors. Vangala further noted that despite alleged smoke exposure dating back to 2002, a 2014 stress echocardiogram revealed no signs of heart disease.

Although Venegar claims his respiratory harm was "self-evident," his principal evidence was his own testimony and that of his own treating physician, Dr. Juste, who admitted he relied substantially on Venegar's description of his symptoms. One Hospital employee testified he did not recall Venegar complaining about secondhand smoke or observe him experience breathing difficulties at work. Another suggested that Venegar was not regularly on the smoking patio. Dr. Vangala similarly confirmed that from 2014 to 2018, Venegar had limited smoke exposure due to workplace changes and because he went on leave several times during that period. Together with testimony about the patio being an open, outdoor space, this is evidence jurors could have relied on to question Venegar's characterization and determine that his exposure to secondhand smoke was not a significant factor in causing adverse health-related effects.

In sum, the deferential standard of review compels us to conclude the jury had substantial evidence to reject Venegar's claim that the Hospital caused him cardiac or respiratory harm.

2. *Emotional Harm*

Dr. Anthony Reading, Venegar's expert psychologist, testified that he interviewed Venegar, administered three psychological tests, and reviewed his deposition and medical records. Dr. Reading concluded that Venegar's diagnosed psychological symptoms were likely caused by his feelings of loss—loss of safety, loss of self-worth, and loss of his job. Reading also noted Venegar's ongoing feeling that his physical well-being was being threatened. He found evidence to support his conclusion, to a reasonable degree of

23

psychiatric probability, that Venegar developed an adjustment disorder with anxiety and depressed mood, which "would not have occurred absent what happened at work."

In contrast to Venegar's psychology expert, however, his treating psychiatrists did not link his psychiatric issues to secondhand smoke exposure. Venegar's treating psychiatrist, Dr. Divyakant Kikani, documented a visit with Venegar in May 2014, several months before Venegar's formal accommodation request that year. Venegar never brought up any concerns about exposure to secondhand smoke at work when discussing his mental health. In medical records dated June 2016, Venegar's treating psychiatrist Dr. Harbans Multani did not attribute Venegar's psychiatric issues to secondhand smoke, but noted "problems at work as my seniority is pull down" and "financial problems."

The jury could have given more weight to the assessments of Venegar's treating physicians than his expert. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633 (*Howard*) ["So long as it does not do so arbitrarily, a jury may entirely reject the testimony of a plaintiff's expert, even where the defendant does not call any opposing expert and the expert testimony is not contradicted."].) They were specifically advised that they "do not have to accept an expert's opinion. As with any other witness, it is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision. You may believe all, part, or none of an expert's testimony."

The jury was within its discretion to conclude that Venegar failed to prove his mental health symptoms were the result of the Hospital's failure to accommodate his respiratory condition by eliminating or mitigating his exposure to secondhand smoke.

3.    *Economic Harm*

The basis for Venegar's theory of economic harm is that the Hospital's conduct forced him into early retirement and diminished his earning potential.  His theory assumes that the Hospital's failure to accommodate caused his near heart attack, which led to his premature retirement.  As we have already explained, there was evidence that would have allowed the jury to reject the argument that secondhand smoke was a substantial factor in causing Venegar's heart condition.  In addition, there was ample evidence to suggest that the heart condition did not cause Venegar to retire early.

At trial, Venegar admitted telling his pulmonologist in December 2017 that he planned to retire within a year, meaning he would retire during 2018.  This was two months before his near heart attack in February 2018.  Consistent with that plan, he retired in November 2018.  Because he told his doctor before his near heart attack about this plan to retire in 2018, it undermines his testimony and argument that his near heart attack forced him into an early retirement.

Venegar's statement to his pulmonologist about a planned 2018 retirement also contradicted he and his wife indicating they planned to retire in 2020, which he admitted created a "discrepancy."  This contradictory testimony as to when he planned to retire may have undermined his credibility as to the real reason for his retirement.

Finally, Venegar's theory of economic harm relied on the testimony of his economic expert, Richard Ruiz. But the jury was free to reject Ruiz's testimony, particularly given the extent to which it relied on assumptions that the jury could reasonably have found unsupported by the evidence. For example, Ruiz's projections regarding Venegar's economic harm were contingent on the assumption that his wage loss began in February 2018, the date of his stent placement. As discussed above, however, there was sufficient evidence for the jury to conclude that Venegar's heart issues were largely unrelated to secondhand smoke exposure. The testimony of an expert witness "is only as good as the facts and reasons on which it is based." (*Howard, supra*, 72 Cal.App.4th at p. 633 (quoting California Jury Instruction 2.40).) "If the jury finds that the party offering expert testimony has failed to prove any foundational fact, . . . the jury is required to consider that in evaluating the expert testimony." (*Ibid.*)

Constrained by the applicable standard of review, we conclude there was substantial evidence supporting the jury's finding that the Hospital's failure to accommodate was not a substantial factor in causing harm to Venegar.

## DISPOSITION

We reverse the trial court's order granting summary adjudication on Venegar's causes of action for disability discrimination, failure to engage in a timely good faith interactive process, retaliation, and intentional infliction of emotional distress.  We affirm the trial court's order granting summary adjudication of his age discrimination claim and the jury's verdict in favor of Dignity Health on the failure to accommodate cause of action.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DO, J.

27